(3) If a hearing is required in this court, it shall be given preference on our docket.

For the reasons herein assigned the judgments of the trial court in all three prosecutions sustaining the defendant's motion to suppress are reversed, and the cases are remanded to the trial court for further proceedings.

264 So.2d 621

**Robert BOUDREAUX et al.**

v.

**The AMERICAN INSURANCE COMPANY.**

**No. 51395.**

Feb. 21, 1972.

On Rehearing June 29, 1972.

Edmond R. Eberle, New Orleans, for plaintiffs-appellants-applicants.

Dillon & Williams, Gerard M. Dillon, New Orleans, for defendant-appellee-respondent.

HAMLIN, Justice:

We directed certiorari to the Court of Appeal, Fourth Circuit, for review of its judgment which affirmed the judgment of the trial court dismissing plaintiffs' suit for damages allegedly suffered by the death of their father resulting from a restaurant fire. Art. VII, Sec. 11, La.Const. of 1921; La.App., 245 So.2d 794; 258 La. 759, 247 So.2d 861.

On February 24, 1967, sometime after 1:00 A.M., a fire occurred in Charlie's Steak House, 4510 Dryades Street, New Orleans, Louisiana. An alarm was turned in at 1:52 A.M. by a passerby, and shortly thereafter a general alarm was struck. Edward Morris Boudreaux, a sixty year old elevator operator employed by Charity Hospital, occupied an attic apartment in an adjoining building, 4506 Dryades Street, which was separated from Charlie's Steak House by a community wall. Boudreaux, who was alone in his apartment at the time of the fire, died as a result of suffocation due to smoke inhalation. His body was discovered by David Fontaine, Jr., Director of Fire Prevention Division of the Fire Department of the City of New Orleans.[1]

On May 18, 1967, suit was instituted by the present plaintiffs, the five children of Edward Boudreaux, and their mother, Gladys Chalaire Boudreaux, against The American Insurance Company the liability insurer of "Charles Restaurant, Charles

---

1. Fontaine testified:

"Q. What did you do when you returned to the scene? [He had gone a short distance away to get Charles Petrossi, owner of the business.]

"A. I attempted to get to a gentleman who was supposed to be on the third floor. We threw a ladder up in the front of the building, and there was a window fan which blocked us. I personally went up to the second floor, but could not find an entrance to this attic apartment.

I came back down, and by this time Mr. Boudreaux, not Boudreaux but Berkett, the owner of the service station that owns the building arrived on the scene and he went up with me. Then he showed me how to enter the building. I sent him out of it and went to the attic.

I searched the building and there was no one in the bed. Of course, this thing is full of smoke. I just felt around and, of course, I had to get out.

I went back the third time and at this time I found Mr. Boudreaux at the foot of the bed."

Fontaine turned in the general alarm and arrived at the scene of the fire shortly thereafter. He testified:

"Q. Now, when you first saw the fire would you again tell us to what extent the building was ablaze?

"A. The building was approximately fifty per cent completely involved, because it came through the attic. It was illuminating the whole area.

"Q. When you say the building, are you speaking about Charlie's Steak House?

"A. Right.

"Q. You're not speaking about the adjoining premises in which you found Mr. Boudreaux, are you?

"A. No, sir."

Petrossi"; defendant's exception of no right of action was maintained as to Mrs. Boudreaux because of her divorce from Edward Boudreaux, the deceased, in 1966. In their original petition, plaintiffs alleged:

"III.

"The said accident was caused solely through the negligence of C. Petrossi in that:

"1. He allowed a dangerous fire condition to remain after he knew or should have known of said danger.

"2. In that he had been repeatedly warned of the hazardous nature of his operation and he refused and neglected to do anything about it.

"3. That he allowed waste matter to accumulate and refused to employ proper preventive methods that would have prevented said fire.

"IV.

"That the said death was caused through the gross negligence of C. Petrossi in that he violated all of the local fire laws of the State of Louisiana and that said violation was directly resulted in the death of Edward Morris Boudreaux."

Defendant denied negligence on the part of its insured and alternatively pleaded contributory negligence on the part of the deceased "in that at the time of the said fire and his death he was intoxicated as a result of the prior consumption of alcoholic beverages or alcohol, that he failed to discover the existence of the said fire and of the smoke that caused his death, that he failed to timely heed the warning of the fire in the premises occupied by him, that he failed to promptly evacuate his room and leave the said premises, and in that he failed to exercise due care for his own safety, which was a proximate cause of his death." [2]

The trial court rendered judgment in favor of defendant and dismissed plaintiffs' suit at their costs.

The Court of Appeal found that the cause of the fire was not proven. It correctly analyzed and narrated the testimony and evidence of record as follows:

" * * * two New Orleans Fire Department officials, whose opinions con-

---

2. A report of the Forensic Laboratory, Coroner's Office, to the Coroner's Office recites in part:
"Examination Requested: Alcohol, Barbiturates, Carbon Monoxide.
"Description of Investigation: Death of Edward M. Boudreaux.
"Subjects:
"Specimens"

"1. One sample of blood from the above subject.
"RESULTS OF LABORATORY EXAMINATION:
"Chemical analysis of the above specimen revealed an alcohol level of 0.12%, was negative for the presence of barbiturates and revealed a carbon monoxide level of 35% saturation."

flicted in several respects, agreed it [the fire] originated in the kitchen of the restaurant. Anthony Engolia, a fire inspector who conducted the official investigation, testified the damage was so extensive it was not possible to determine what caused the conflagration. He arrived on the scene at 2:15 A.M., approximately fifteen minutes after the first alarm was sounded, to find the building engulfed in smoke and flames.

"Engolia testified he conducted his investigation hours later after the fire had been extinguished. One significant conclusion he reached was that the fire extinguishing system installed in the kitchen did function, since traces of baking soda were found in the charred debris. He explained this equipment was activated when heat from the flames reached 185° temperature, thus releasing quantities of baking soda designed to drop and smother the flames. In order for the system to operate automatically, the heat from the fire must first melt fuse links that ordinarily keep the powdery substance from being discharged. His investigation disclosed these links were in fact melted.

"The second official to testify was David Fontaine, director of the Fire Prevention Division of the New Orleans Fire Department. He, too, visited the fire while it was in progress and visited the scene once it had been extinguished. Although he stated twice it was impossible to determine the cause of the fire, he speculated it started when a flame from the kitchen somehow passed through one of the overhead grease filters into the duct work and ignited grease accumulated on the sides thereof. This duct work runs through the interior of the building to the second floor ceiling before it reaches to the outside of the building.
\* \* \*[3]

3. Fontaine testified:
"Q. In your official capacity did you determine the origin of the fire?
"A. Yes, sir. It originated in the kitchen.
"Q. Did you determine the cause of the fire, Mr. Fontaine"
"A. No, sir.
\* \* \* \* \*
"Q. Mr. Fontaine, did this open stairwell contribute in any way to the rapid speed of this fire?
"A. It had to help, there is no way to get by it. The fire actually went through the kitchen floor, ceiling rather and travelled. But this would leave hot gasses go up and this was a contributing factor.

"Q. Hot gasses were going up the stairwell?
"A. Yes.
"Q. A contributing factor in what, the speed of the fire and spread of the fire?
"A. Right.
"Q. Initially we had asked you what was the origin of the fire, or where did the fire originate, and you mentioned the kitchen. And I believe I asked you as to what was the cause of the fire, and I believe your answer was that you didn't know, and is that substantially correct?
"A. Right.
"Q. But then when we further asked you questions it seems like you pinpointed the origin of the fire in the duct work?

"In addition to the testimony of the expert fire officials, evidence was adduced describing the restaurant kitchen equipment, and its use and maintenance. The appliances included a stove and two broilers placed next to the rear wall of the kitchen and a deep fryer positioned against the side wall opposite the party wall. All have pilot lights, according to the restaurant employees, that are lit each morning when the kitchen is open and extinguished by being 'fanned out' at night when the kitchen closes. Workers also described pouring six to eight gallons of grease into the deep fryer each morning and draining it out each night.

"A. Right, sir.

"Q. Is this speculation or positiveness, or how would you classify that?

"A. This goes through past experience. Actually pinpointing the orgin of the fire is fairly easy to do. What caused the fire is something else.

You could take a building and burn it to the ground, and I can bring you back to the origin of the fire. But for me to tell you what caused the fire would be difficult.

"Q. In your experience what caused this fire in the duct work?

"A. Accumulation of grease that unfortunately you can't clean it all out. And they should have it removed at least annually. There is no way, and it's impossible for anyone to see the accumulation.

If a man has a restaurant and he only serves some steaks a week, and another man sells that many in a year he might have to clean his out once a year, so it's really hard to say.

"Q. What do you recommend?

"A. We recommend that it be taken off, that is the filter be taken off at least once a week and cleaned with a separate set of filters and replaced. Even this is a

While not in use, the grease was stored in a metal container that was kept either in the yard or the kitchen. The testimony is in conflict on this point.

"On the night of the fire, the cooks then on duty testified that they performed their usual chores before leaving, namely, cleaning the appliances, draining and storing the deep fryer grease and turning off all the pilot lights. These duties were completed by midnight, at which time the kitchen closed and the cooks went home. Charlie's bar remained open, as it usually does, for another hour. Before locking up the res-

common practice, but it's still no solution to the problem.

"Q. Now, the duct work that you mentioned where you feel was the origin of the fire, is there just one section of this duct work that you feel was the origin?

"A. The duct work covered the entire cooking area, then it went out through the vent.

"Q. Through the screen we identified?

"A. Yes, sir.

"Q. Could you determine after the fire the existence of excessive amounts of grease for example on this grill, or what was the condition of the grill?

"A. The only thing that you could actually determine was the fact as the fire got hotter the grill work changed, or your vent changed color where there was combustion.

"Q. And you're referring to P-3?

"A. Yes, sir. As the fire got hotter they had soot on here as you can see. (indicating).

\*     \*     \*     \*     \*

"Q. Mr. Fontaine, are there any other possibilities as to the origin of this fire?

"A. I don't believe so, sir."

taurant that night, the bartender testified he checked the kitchen and was positive none of the stoves or broilers were lit.[4]

"As to maintenance, the record discloses that extensive renovations were completed in the kitchen within six weeks before the fire. Charles Petrossi testified the duct work, the hood over the stove and broilers, the grease filters, the duct work for the exhaust system, the vent stack and the fire extinguishing system were all new. The filters were cleaned weekly and Petrossi was endeavoring to find someone to clean the interior of the duct work several days before the fire occurred. * * * Petrossi's employees corroborated his testimony as to the installation of new equipment and its subsequent maintenance. Further, invoices from the contractor substantiate work was performed as the owner stated."

4.  Joseph Thomas LaGreca, waiter and bartender who works the night shift, testified in part:

"Q. You worked the night of the fire?
"A. I did.
"Q. What time did you leave the premises?
"A. Oh, about a quarter to one.
"Q. Were you the last one to leave?
"A. I was.
"Q. How do you remember it as a quarter to one?
"A. Well, we generally leave every night between one, twelve-thirty and one o'clock.
          *          *          *          *          *
"Q. Do you remember the night of the fire?
"A. Yes.
"Q. You remember distinctly it was a quarter to one that you closed?
"A. Yes, sir. About.
"Q. Did you look at your watch or anything to remind you?
"A. Well, I know I got home about one o'clock and it takes me about fifteen minutes to go home.
"Q. Who left with you, or did anybody?
"A. The porter.
          *          *          *          *          *
"Q. It was your function to lock up the place?
"A. Yes.
"Q. Would you tell me what you do when you are closing up the restaurant?

"A. The last thing I do, I check the kitchen and see that all the stoves are out, deep fryers all empty, the coffee urn out, see that everything is locked up and everything is all right.
"Q. You did that all this particular night in question?
"A. Yes, I did.
"Q. What is that, just a slight check, or did you actually go check the instruments themselves?
"A. I do that.
"Q. Is that just a slight check by looking at the stove?
"A. No, I go way under there and see that all the pilots are out and everything.
"Q. You turn the pilot off?
"A. They already are off when I check them.
"Q. Everything was off when you checked on this particular night?
"A. Yes.
"Q. You lock up the premises?
"A. Yes.
"Q. When did you find out that a fire had occurred?
"A. Oh, I think about eight, nine o'clock in the morning. My wife woke me up and told me that Charlie's Steak House went down. I said, it couldn't be because I had left there and I had checked everything and everything was alright. I told her that it must be a mistake, that it was Frank's Steak House. That's what I thought. And I didn't pay no attention to it."

The Court of Appeal found that Fontaine's testimony was contradictory and was weakened by himself; it further found that it did not establish the cause of the fire by a preponderance of the evidence. It felt that there was no probative evidence of record to remove the cause of the fire from the realm of speculation. The Court held that the doctrine of res ipsa loquitur did not apply to the instant matter. It said, "While we concede the possibility fire could have started from one of a number of sources in the kitchen, it is illogical to infer there was no other reasonable cause to which it could be ascribed." The Court further held that the liability set forth in LSA–C.C. Art. 667 did not attach to the instant matter. It concluded, "Thus we conclude the trial court properly dismissed this suit on a finding plaintiffs failed to establish defendant's negligence by a preponderance of the evidence."

Plaintiffs assign the following errors to the decision and judgment of the Court of Appeal:

"I. The Court of Appeal erred in holding that plaintiffs have not proved their case by a preponderance of the evidence.

"II. The Court of Appeal erred in holding that the doctrine of res ipsa loquitur was inapplicable.

"III. The Court of Appeal erred in failing to hold that defendant's

insured is liable under the absolute liability provisions of Revised Civil Code article 2315 analogized with article 667."

Defendant submits: "The opinion of the Court of Appeal in this case is reported as Boudreaux v. American Insurance Company, La.App., 245 So.2d 794. The pertinent findings of fact are aptly stated therein and, defendant submits, also the correct conclusions of law with respect thereto."

## PREPONDERANCE OF EVIDENCE

Preponderance in law means credibility, influence, and weight and not the number of witnesses. Wilson v. Morris, La. App., 139 So.2d 93, cert. denied.

"By a preponderance of evidence is meant, simply, evidence which is of greater weight, or more convincing, than that which is offered in opposition to it; that is, evidence which as a whole shows that the fact or causation sought to be proved is more probable than not. Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276; Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395; Perkins v. Texas & New Orleans Railroad Company, 243 La. 829, 147 So.2d 646. This proof may be made not only by direct evidence, but also by circumstantial evidence which excludes other reasonable hypotheses 'with a fair amount of certainty.' Naquin v. Marquette Casualty Company, supra."

Gassiott v. Gordey, La.App., 182 So.2d 171 (1966). See, Duhon v. Cormier, La.App., 186 So.2d 645, 648.

"The law places the burden of proof on plaintiff to establish by a preponderance of the evidence the facts upon which she relies for judgment. The term 'preponderance of the evidence' means that evidence or that part of the evidence which is of greater weight, which is more convincing and which best accords with reason and probability. A preponderance of the evidence may be said to be that part of the evidence which, because of its apparent correctness, its convincing nature, its quality or its weight, tips the scales in favor of the party upon whom the burden of proof rests." Bailey v. Travelers Insurance Company, La.App., 210 So.2d 93, writ refused, 252 La. 832, 214 So.2d 160 (1968).

"The general rule, well established in our jurisprudence, is that negligence is never presumed. Thus, negligence or lack of due care can never be inferred from the mere fact that an accident has occurred. In order to recover damages allowed by our laws for injuries sustained in an accident, a plaintiff bears the burden of proving to a legal certainty by a reasonable preponderance of the evidence each alleged element of negligence contributing to the injury." Valentine v. Kaiser Aluminum & Chemical Corp., La.App., 205 So.2d 757 (1968).

Negligence must be established with reasonable certainty and by a preponderance of the evidence. Probabilities, surmises, speculations, and conjectures cannot be accepted as sufficient grounds to justify a recovery to a plaintiff who is charged with the burden of proof. Mayes v. McKeithen, La.App., 213 So.2d 340 (1968).

"Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other *possible* causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation." Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395, 397.

In our opinion, plaintiffs have not met the burden of proof imposed upon them. They sought to prove negligence on the parts of defendant's insured and his employees; this they did not do. The theories advanced as to the cause of the fire —escaping gas, accumulation of grease in the ducts, ignition of the accumulated grease by a spark, ignition of drained grease from the deep fat fryers, an unenclosed stairwell, a deficient building, inefficient fire extinguishing equipment, etc.— are speculative. There is lengthy testimony that the fire originated in Petrossi's

kitchen, but plaintiffs did not prove to a legal certainty by a reasonable preponderance of the evidence that the cause of the fire allegedly originating in the kitchen was caused by the negligence of Petrossi and his employees. Plaintiffs presented probabilities, surmises, and speculations; a large amount of the testimony is conjecture. The evidence does not show that the facts sought to be proved were more probable than not. Plaintiffs did not meet the test set out in Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151, 155 (1971), to the effect that, "Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not." See, Southern Farm Bureau Casualty Ins. Co. v. Florane, La.App., 173 So.2d 545 (1965). We conclude that plaintiffs who bore the burden of proof did not present evidence of such quality, conviction, and weight as to tip the scales in their favor.

## RES IPSA LOQUITUR

Plaintiffs contend that a better set of facts than is herein presented for the application of the doctrine of res ipsa loquitur is hard to imagine. They argue that a commercial kitchen fire, erupting to sizeable proportions shortly after closing hours, emitting smoke and flames, resulting in the death of a sleeping neighbor, would seem to compel the application of the doctrine.

"For the doctrine of res ipsa loquitur to be applicable, the evidence as to the circumstances connected with the accident must be of such a nature that it creates an inference that the accident was caused by the negligence of the defendant, and with a fair amount of certainty excludes every other reasonable hypothesis as to the cause of such accident. This inference is not drawn merely because the accident occurred or the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty, and that there is no other reasonable or logical explanation for the occurrence of such an accident. * * *" Fruge v. Trahan, La.App., 194 So.2d 478, 482 (1967).

It is the settled jurisprudence of this State that the doctrine of res ipsa loquitur is not a rule of pleading or substantive law, but rather a rule of evidence. Minton v. Continental Insurance Company, La. App., 110 So.2d 789, 792 (1959).

"A determination of a proper instance for application of the principle of res ipsa loquitur has been the subject of volumes of discussion by learned jurists and legal scholars, who have been at pains to point

out that the maxim means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that the rule rests for its justification upon the common experience that accidents from such causes do not commonly occur in the absence of negligence; and that it is the lack of direct evidence indicating negligence on the part of the defendant as the responsible human cause of a particular accident which actually furnishes the occasion and necessity for invoking the rule in its strict and distinctive sense. *It is generally conceded that res ipsa loquitur in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage.* When all the evidence is in, the question is still whether the preponderance is with the plaintiff. All that is meant by res ipsa loquitur is 'that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on

the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty.'" (Emphasis ours.) Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389 (1957).

"Although the general rule of law is that a plaintiff who claims damages must allege and prove the facts necessary to establish the negligence of defendant, upon which he predicates his demand, it is equally a well-recognized exception to that general rule that, where the cause of the accident by which the damage was inflicted is more properly within the knowledge of defendant, the accident itself makes out a prima facie case, and the burden is upon the latter to show absence of negligence." Dotson v. Louisiana Central Lumber Co., 144 La. 78, 80 So. 205 (1918).

"This court has pointed out in numerous decisions that res ipsa loquitur is a rule of evidence, the applicability of which is to be determined in each case at the conclusion of the trial. When the doctrine of res ipsa loquitur is applicable to a case, the accident which has caused plaintiff's damage makes

out a prima facie case of negligence on the part of the defendant, and the burden is then on the defendant to show absence of negligence on his part." Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395 (1955). See, Valentine v. Kaiser Aluminum & Chemical Corp., La.App., 205 So.2d 757.

A review of this record does not reflect that the alleged negligence of defendant's insured excludes every other reasonable hypothesis as to the cause of the fire. Petrossi had knowledge of the physical arrangement of his kitchen; he had knowledge of the operation of the restaurant and bar; he had knowledge of the daily and nightly routine of his employees; he had no knowledge of the cause of the fire. We agree with the Court of Appeal that the fire could have started from a number of sources in the kitchen, but it would be illogical to infer that there was no other reasonable cause to which it could be ascribed (vandalism, carelessness of parties other than Petrossi and his employees, combustion, and sudden electrical malfunction are only a few that could be mentioned). We cannot say that under the facts proved at trial a reasonable and fair conclusion would be that the instant accident was due to an omission by Petrossi or his employees.

Even if we were to admit, for the sake of argument, that res ipsa loquitur applied to this matter and that plaintiffs had placed in the scales proof of the accident and sufficient attending circumstances, we must find that the defendant under the present facts and circumstances exculpated itself from negligence. Petrossi and his employees proved that the cause of the fire was unknown; they proved that the operation of Charlie's Steak House was clean, painstaking, and considerate of danger. As stated supra, res ipsa loquitur is a rule of evidence; if the burden shifted to defendant, we find that the insured and his employee bore their burden of proof by a preponderance of the evidence. We do not find that defendant's failure to call the Fire Marshal as a witness indicates that he would have testified against the insured; plaintiffs were not precluded from calling him to testify in *their* behalf. Thus, the argument advanced by plaintiffs that defendant should have called the Marshal as a witness is without merit.

## ABSOLUTE LIABILITY PROVISIONS OF LSA–C.C. ARTICLE 2315 ANALOGIZED WITH ARTICLE 667

LSA–C.C. Article 667 provides:

"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

LSA–C.C. Article 669 provides:

"If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place."

In Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133, 140 (1971), we said: "We do not here establish a new standard for liability, but merely apply the standard set by law and applied repeatedly in our jurisprudence. The activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. See Yommer v. McKenzie, 255 Md. 220, 257 A.2d 138 (1969)."

Plaintiffs submit that in the above words of the Langlois case, "the defendant's insured has killed this decedent by its fault as analogized from the conduct required under Civil Code Article 667 and others, and responsibility for the damage attaches to defendant under Civil Code Article 2315."

We do not find the case of Langlois, supra, apposite to this matter. Langlois involved the emission of gas from the plant of Allied Chemical Corporation and the contraction of chemical bronchitis by plaintiff. Damages were allowed under the theory of strict liability.

Likewise, we do not find the case of Chaney v. Travelers Insurance Company, 259 La. 1, 249 So.2d 181, cited by plaintiffs, apposite to this matter. That case involved damage done by vibration. In awarding damages, this Court held that an activity which causes damage to a neighbor's property obliges the actor to repair the damage, even though his actions are prudent by usual standards.

Reason dictates and justice demands that, in the final analysis, each case has a peculiar and separate life of its own. The problems of one case are not the problems of another, and therefore each case must be decided on the facts and circumstances shown to exist therein.

The instant fire, cause unknown as found supra, did not occur as the result of a usual act. No activities were being conducted either in the restaurant or in the bar at the time the fire commenced. The kitchen, the restaurant dining room, the bar, and all other facilities were closed; the last remaining employee had departed. Therefore, Petrossi was doing no work on his property which deprived Boudreaux of

the liberty of enjoying his attic apartment. The evidence, supra, does not establish that the fire resulted from work carried on in Charlie's Steak House *before* closing time. Strict liability cannot be imposed merely because of ownership; under the facts and circumstances herein, LSA–C.C. Art. 667 does not apply to the accident suffered by Edward Morris Boudreaux. No damage attaches to defendant under LSA–C.C. Art. 2315 (Liability for Acts Causing Damage).

For the reasons assigned, the judgment of the Court of Appeal, Fourth Circuit, is affirmed. All costs to be borne by plaintiffs.

SANDERS and BARHAM, JJ., concur in the result.

SUMMERS and DIXON, JJ., dissent.

TATE, Justice.

I respectfully dissent.

The plaintiffs' case depends upon circumstantial proof that the defendant's insurer's negligence was the cause of the fire in the insured's premises. This fire caused the death of the plaintiffs' decedent as he slept in his apartment in the adjacent premises.

The majority commits error of law in holding that such circumstantial proof and the res ipsa loquitur inference failed because it failed to *exclude "every other reasonable hypothesis as to the cause of the fire."* 262 La. 743, 264 So.2d 628. (Italics mine.) By so holding, the opinion of the court holds the plaintiff to the burden of proof in *criminal* cases, i. e., that of proving beyond a reasonable doubt the fact sought to be proved,[1] for it adopts the heavy burden of proof by circumstantial evidence required for conviction in *criminal* cases.[2]

As the opinion of the court recognizes, in *civil* cases, a party need only prove his case by a preponderance of the evidence, not beyond a reasonable doubt. As the majority notes, we have recently summarized the several judicial formulations of this burden of proof in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155 (1971), as follows:

"In describing this burden of proof, the courts sometimes speak of proof to a 'reasonable certainty' or to a 'legal certainty'; or of proof by evidence which is of 'greater weight' or 'more convincing' than that offered to the contrary; or (in the case of circumstantial evidence) of proof which

[1]. La.R.S. 15:271 (1966) regulating procedure in criminal cases, provides: "The plea of not guilty throws upon the state the burden of proving, beyond a reasonable doubt, every fact and circumstance necessary to constitute defendant's guilt."

[2]. See La.R.S. 15:438: "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, *it must exclude every reasonable hypothesis of innocence.*" (Italics mine.)

excludes other reasonable hypotheses than the defendant's tort with 'a fair amount of certainty'. Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not."

Further, as we specifically held in Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963), by this burden of proof, the circumstantial evidence requisite in civil negligence cases need not negate *all* other *possible* causes of injury, as the present opinion of the court holds. It suffices if the circumstantial proof excludes other reasonable hypotheses only with a fair amount of certainty, so that it be more probable than not that the harm was caused by the tortious conduct of the defendant. 153 So.2d 396, 397.

In this respect, the principle of "res ipsa loquitur" (the thing speaks for itself) sometimes comes into play, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury *in the absence of other explanation* by witnesses found credible. Pilie v. National Food Stores of Louisiana, 245 La. 276, 158 So.2d 162 (1963); Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389 (1957); Malone, Res Ipsa Loquitur and Proof by Inference, 4 La.L.Rev. 70 (1941).

As we most recently stated in King v. King, 253 La. 270, 217 So.2d 395, 397 (1968): "Res ipsa loquitur is a rule of circumstantial evidence. Its applicability is determined at the conclusion of the trial. *The rule applies when the facts shown suggest the negligence of the defendant as the most plausible explanation of the accident.*" (Italics ours.)

By reverting to the present facts, I hope to show that the evidence as a whole proves that the negligence of the defendant is the most plausible explanation of the cause of the fire which killed Boudreaux, sleeping in his bed in his home in the adjacent premises.

Reverting to these facts, they show:

The decedent Boudreaux lived in an attic apartment in the premises next to Charlie's Steak House. The defendant is the liability insurer of Petrossi, the owner and operator of this popular restaurant, which does a large business (four cooks, great stove, two broilers, deep fryer, etc.) in selling high quality steaks to numerous customers.

The nature of the cooking done involves a large and constant accumulation of grease in the filters and ductwork above the heavy cooking equipment. This requires frequent cleaning, in order to avoid the possibility of fire being ignited by sparks or ignited grease from the high temperature and constant cooking.

On February 24, 1967, Charlie's Steak House was destroyed by fire. The decedent in the adjacent premises, separated only by a frame party wall, was suffocated by the heavy smoke.

On the night of the fire, the restaurant kitchen was closed at midnight. The restaurant itself was closed and locked at 1:00 a. m., with the last employee to leave checking the kitchen and observing no fire or smoke.

At 1:52 a. m., less than one hour later, a fire alarm was turned in. When David Fontaine, Jr., director of the fire prevention division of the New Orleans Fire Department, arrived at the scene five minutes later (at 1:57 a. m.), the fire was already of such intensity that it was already blazing through the restaurant's second story roof and pouring smoke into the adjacent premises in which Boudreaux lived. Since the restaurant had been completely locked up, Fontaine immediately secured the presence of the owner (Petrossi) at the fire in order to gain entry if needed. Fontaine also called in a general alarm for this large fire, already out of control insofar as saving the half-destroyed restaurant premises.

Both Fontaine and Engolia (an inspector in Fontaine's department who investigated the fire for Fontaine) agreed that the origin of the fire was in the kitchen. This was determined by the area of the heaviest damage, as well as by the location of the charring on the ductwork leading from the kitchen. Fontaine was of the further opinion that the origin and heaviest intensity of the fire was in such ductwork, in which grease accumulated above the stove. I do not read Engolia's testimony as contradicting this opinion.

Neither of these experts was able to testify definitely as to the cause of the fire, although Fontaine was of the reasoned opinion, based upon his extensive experience of fire investigations, that it had originated in the ductwork where the grease had accumulated. (The owner, Petrossi, admitted in this testimony that such ductwork had not been cleaned since its installation 5–6 weeks before. He was looking for a man to clean it just before the fire.)

As Fontaine pointed out, if fire from a spark or from ignited grease had gotten into the accumulated grease in the ductwork behind the filter screen, the employees in the kitchen could not have observed the fire or felt the heat at the time the restaurant closed, since the fan in the ductwork vents would draw off any smoke or heat, at least in the early stages of the fire. See Fontaine deposition, tr. 39–40.

Fontaine was of the definite opinion that the fire extinguisher above the hood of the stove had not been triggered by heat until *after* the fire. He reached this conclusion because of personal observation of the location and intensity of the fire at the time

he arrived on the scene, the first fire department official to do so, and because of the nature and the amount of undischarged dry chemical found the day after the accident.[3] See Fontaine transcript 13–17, 23. Engolia felt that the residue of dry chemical indicated that the extinguisher had gone off, and he was unwilling to state that it had not gone off during the fire.

Fontaine also felt that an open stairwell from the first to the second floor of the steak house contributed to the rapid spread and intensity of this fire. The open stairwell permitted hot gasses to go up to the second story and to add to the intensity of the conflagration which went through the kitchen ceiling after its earlier ignition. Tr. 50. The open stairwell was in violation of New Orleans Building Code,[4] as well as of state law, La.R.S. 40:158, subd. B.

Under the facts outlined, I think the preponderance of the evidence shows the cause of the fire and its rapid spread was the negligence of the defendant. When the fire official arrived at the scene less than an hour after the restaurant was closed, the fire was already of such intensity as to have half-destroyed the building. The premises were locked and inaccessible to anyone but the owner or his employees, and they had been under his control and supervision right up until closing. I cannot readily think of any cause of the fire other than some negligence of the owner, such as permitting the grease in the kitchen ductwork to have become ignited.

Furthermore, the evidence strongly suggests that the owner's negligence contributed to the start and the rapid spread of the fire in at least two admitted respects: his permitting the grease to accumulate in the ductwork without any cleaning of it whatsoever prior to the fire, and his failure to close the stairwell with a door, a routine fire-precaution. Additionally, the evidence strongly suggests that he either negligently

---

3. He was of the opinion that, after the fire, the extinguisher system had been manually triggered. His testimony further points out that the extinguisher device could be set so that it would *not* go off even if the heat over the stove were intense, and that, without such tinkering to prevent triggering, *all* extinguisher heads in the kitchen system would go off all over the kitchen and over all the cooking food, if any *one* of them were subjected to too much heat. Fontaine, Tr. 21–22.

4. Since the premises had been built before the effective date of the New Orleans Building Code in 1956, the owner of the premises was not subject to misdemeanor prosecution for violation thereof, under the Code's grandfather clause. Nevertheless, the prohibition of open stairwells was to protect the public safety and health and to prevent fires, and its continued maintenance falls behind the standard of ordinary care owed by the owner of a building to its occupants and neighbors. I am aware of no authority that would exempt from *tort* liability an owner who maintains unsafe premises, even though the owner is not subject to *criminal* prosecution.

or intentionally permitted the fire extinguisher in the ductwork area to become nonoperative automatically (so as no longer to be triggered automatically by fire).

Should more be necessary for the plaintiff to sustain his burden of proof, I think he can invoke the inference of fault permitted by application of the res ipsa loquitur principle.

As the authorities previously cited note, where there is no direct evidence of the defendant's negligence, then in satisfaction of the plaintiff's burden to prove it by a preponderance of the evidence, he may be permitted by application of this principle to rely upon an inference of the defendant's negligence which arises from proof of the accident and the surrounding circumstances.

In perhaps our most recent discussion of the issue, we suggested the real test of applying the principal to be as follows: "Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the *most plausible* explanation of the accident?" Pilie v. National Food Store, cited above at 245 La. 276, 158 So.2d 165. (Italics ours.) On the other hand, application of the principle is defeated if "an inference that the accident was due to a cause other than defendant's negligence could be drawn *as reasonably* as one that it was due to his negligence." 245 La. 276, 158 So.2d 165. (Italics ours.)

When the cause of the fire may as plausibly be ascribed to cause other than the defendant's negligence, then of course the inference arising from the res ipsa loquitur principle is not available in aid of the plaintiff's case. Brown & Blackwood v. Ricou-Brewster Corp., 229 La. 1037, 121 So.2d 70 (1960).

In facts generically similar, where a fire started at a filling station and the operator relied upon its cause as unexplained, we stated in Jones v. Shell Corporation, 186 La. 1067, 171 So. 447, 449 (1936):

"While negligence is never presumed as a matter of law from the happening of an accident, the happening of the accident with its attendant circumstances may justify the inference of negligence. Thus, when the thing which produced the injury is under the control of the defendant or his servants and the injury would not have occurred unless negligence had been present in some form and the facts causing the injury are peculiarly within the knowledge of defendant and not equally accessible to plaintiff, the burden is on defendant to explain the cause of the accident, if he desires to escape from the inference of negligence."

In holding the defendant liable for failure to absolve himself from negligence, we further stated, 171 So. 449:

"Where the thing which caused the injury complained of is shown to be under the

management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in absence of explanation by defendant, that the accident arose from want of care."

Applying these long-settled principles of Louisiana law, the plaintiffs have met their burden of proving by a preponderance of the evidence that their decedent's death was caused by the defendant's insured's fault.

This being so, I need not discuss the similar liability the defendant's insured may be subject to as being at "fault" under Civil Code Article 2315 under the standard of conduct and activity expressed by Civil Code Articles 667 and 669,[5] nor that liability which might be imposed upon him under Civil Code Article 2317 as the owner of a thing (his cooking machinery from which the fire emanated) which causes damages to another [6].

For the reasons stated above, I respectfully dissent.

---

5. This is the stricter liability of an occupier of premises towards those he injures on neighboring lands by activities on his land or the diffusion of noxious substances from it. Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971); Chaney v. Travelers Insurance Co., 259 La. 1, 249 So.2d 181 (1971).

## ON REHEARING

TATE, Justice.

The plaintiffs are the children of Edward Boudreaux. They sue the liability insurer of Charles Petrossi, d/b/a Charlie's Steak House, for the wrongful death of their father.

The decedent Boudreaux was suffocated in the early hours as he lay asleep in his attic apartment in premises adjacent to the steak house. His suffocation was the result of a major fire which originated in the kitchen of the restaurant shortly after it had closed.

In our original opinion, we affirmed the judgment of the previous courts. They had dismissed the suit because they found insufficient proof that the fire resulted from the negligence of the insured Petrossi. 245 So.2d 794 (La.App. 4th Cir. 1971), certiorari granted 258 La. 759, 247 So.2d 861 (1971). On rehearing, we conclude that the trial and intermediate court decisions erroneously exacted of the plaintiffs a heavier burden of proof than is required by law.

---

6. See Crepeau, Liability for Damage Caused by Things—From the Civil Law Point of View, 40 Canadian Bar Journal 1222 (1962).

The uncontradicted facts show the following:

The decedent Boudreaux was killed as a result of the fire originating in the restaurant premises next door. The restaurant had been closed by an employee and locked up between 12:45 and 1:00 a. m. The restaurant fire was reported at 1:52, and by 1:57 (when the first fire inspector arrived at the scene) the fire was of such intensity that it was through the roof of this two-story building.[1] The building was at that time fifty percent involved by the fire.

Based upon the most intense charring, as well as observations during the fire, the fire inspectors determined that the fire had originated in the kitchen, more specifically in the ductwork[2] above the broilers, stoves, fryers, and other heavy kitchen equipment. Although filters (cleaned once weekly) trapped most of the grease, nevertheless some must filter through and accumulate in the ductwork. The ductwork as well as the filters should also be cleaned regularly, how often depending on the volume of cooking. The ductwork had never been cleaned since installed some five to six weeks before the fire, although the filters had been cleaned weekly.[3]

Since occasionally bits of ignited grease could slip through the filter into the ductwork, the fire extinguishing system was designed to be triggered to extinguish fires within the ductwork. One of the fire inspectors was certain that this fire-extinguishing system had not worked during the fire and had been triggered only after

---

1. Because of its intensity, the fire inspector then struck a general alarm bringing more units and pumpers to the scene, for he believed the four companies and one hook and ladder of the district could not contain it by themselves.

2. Fontaine, Director of Fire Prevention, testified to this effect, Tr. 18, Tr. 26 (identifying P-13 as the picture of the charred ductwork coming through second floor rear of kitchen), Tr. 39, Tr. 50-51, Tr. 52-53 (identifying with red circles probable progress of fire in ductwork shown as photograph P-13). Engolia, fire inspector, testified it originated in the kitchen; in so doing, he also pointed out the ductwork damage shown in P-13. Tr. 11-12. His reluctance in specifically saying that the kitchen fire specifically originated in the ductwork may have been due to his belief of the degree of certainty required: Q. "Could you answer the question?" BY THE WITNESS: "That question, to be one hundred per cent, no. Not to actually say beyond a reasonable doubt that this, you know, happened. I couldn't say." Tr. 11.

3. The insured Petrossi admitted he had been looking for someone to clean the ductwork at the time the fire occurred. The date of installation of the ductwork is uncertain, since based only on invoices delivered after the fire. Fontaine noted that no advance approval had been obtained from the Fire Department, as required, before installation of the new ductwork, Tr. 42, 54, so that the fire department could never be able to determine whether the plans for the filter and ductwork system had been adequate. Tr. 43. The porter who removed the filters for cleaning weekly was not produced as a witness.

the fire; his opinion was based not only upon the height and intensity of the flames observed during the fire but also upon the dryness of the chemical found when the premises were inspected after the fire.[4] The other fire inspector, based on the fuse links he inspected, believed that the extinguisher heads he had inspected had functioned.[5]

When the kitchen closed at midnight, the kitchen personnel cleaned all grease from the stoves, broilers, and fryers. They extinguished all flame, blowing out the pilot lights on the stove (although this, of course, permitted small amounts of gas to continue escaping through the night). The bartender waiter also checked the kitchen for fire, when he closed and locked the premises at 1:00 a. m. If, however, ignited grease had lodged in the grease of the ductwork, this inspection could not have discovered it.

Because of the lack of proof as to what had caused the fire, both the trial and the intermediate court held that the plaintiffs had not proved by a preponderance of the evidence that the insured's negligence was the cause of their decedent's wrongful death. We granted certiorari because of

our doubt that these courts had correctly applied this burden of proof required in civil cases.

Recently, in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155 (1971), we summarized the several judicial formulations of this burden of proof in civil cases and concluded:

"In describing this burden of proof, the courts sometimes speak of proof to a 'reasonable certainty' or to a 'legal certainty'; or of proof by evidence which is of 'greater weight' or 'more convincing' than that offered to the contrary; or (in the case of circumstantial evidence) of proof which excludes other reasonable hypotheses than the defendant's tort with 'a fair amount of certainty'. Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not."

■ Further, as we specifically held in Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963), by this burden of proof, the circumstantial evidence requisite in civil negligence cases need not negate *all*

---

4. See testimony of Fontaine, Tr. 12–23, Tr. 47–48.

5. See testimony of Engolia, Tr. 17: "The damage was very very great. That's why I couldn't come up with an exact cause, you know, to determine, because we had

to walk over, we removed a lot of debris, but there was no—in my mind, there was no doubt that these things did function. Whether they all did, I couldn't truthfully say. The ones I checked did function."

other *possible* causes of injury, as the opinions of the previous courts seemed to hold. It suffices if the circumstantial proof excludes other reasonable hypotheses only with a fair amount of certainty, so that it be more probable than not that the harm was caused by the tortious conduct of the defendant. 153 So.2d 396–397.

In this respect, the principle of "res ipsa loquitur" (the thing speaks for itself) sometimes comes into play as a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury *in the absence of other as-plausible explanation* by witnesses found credible.[6] Pilie v. National Food Stores of Louisiana, 245 La. 276, 158 So.2d 162 (1963); Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389 (1957); Malone, Res Ipsa Loquitur and Proof by Inference, 4 La.L. Rev. 70 (1941); Comment, 25 La.L.Rev. 748 (1965). Thus, by this principle where properly applied, the circumstantial evi-

dence indicates that the injury was caused by some negligence on the part of the defendant, without necessarily proving just what negligent act caused the injury.

We noted in Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So. 2d 389, 391 (1957): " * * * the maxim [res ipsa loquitur] means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference. . . The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence. . . When all the evidence is in, the question is still whether the preponderance is with the plaintiff."

Nevertheless, when all the evidence is in and the question is whether, by reason of the res ipsa loquitur rule, the

---

6. King v. King, 253 La. 270, 217 So.2d 395, 397 (1968): "Res ipsa loquitur is a rule of circumstantial evidence. Its applicability is determined at the conclusion of the trial. *The rule applies when the facts shown suggest the negligence of the defendant as the most plausible explanation of the accident.*" (Italics ours.)
   In addition to describing this principle of circumstantial evidence, the term "res ipsa loquitur" is also sometimes used to describe the burden to prove themselves *not* negligent required of those using dangerous substances or engaging in dangerous activities which injure others or of those under some special relationship of care to others injured through their activity. In this type of situation, the effect of the doctrine is not only to supply an element of proof but also to shift the burden onto such type of defendant to explain or pay. Malone, Res Ipsa Loquitur, 4 La.L.Rev. 70, 95–99, 103 (1941); Prosser on Torts, pp. 213, 223, 228–30 (4th ed. 1971).

plaintiff has preponderantly proved that the defendant is responsible in tort for his injury, we have in our most recent decision on the issue noted that the real test of applying res ipsa loquitur to be as follows: "Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the *most plausible* explanation of the accident?" Pilie v. National Food Store, 245 La. 276, 158 So. 2d 162, 165 (1963). (Italics ours.) On the other hand, application of the principle is defeated if "an inference that the accident was due to a cause other than defendant's negligence could be drawn *as reasonably* as one that it was due to his negligence." 158 So.2d 165 (Italics ours.) See also Comment, 25 La.L.Rev. 748, 764 (1965). This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probably than not, his injury was caused by the negligence of the defendant.

■ Applying these principles to the present controversy, the evidence as a whole shows that the defendant's insured's negligence was the most plausible or likely cause of the fire which caused the decedent's death.[7] We cannot as reasonably ascribe any other cause. In reaching this conclusion, we rely upon the following, among other, facts:

7. Res ipsa loquitur has not infrequently been applied in Louisiana in cases of fire originating on the defendant's premises or in equipment installed by or under the

The fire was spread through half the building in a little more or less than an hour after the restaurant was closed tight for the night. (This indicated it must have burned for some time before it had flared to this extent.) No one other than the insured's employees is shown to have had access to these premises subsequent to the time the restaurant was closed. Prior to then, the insured's employees had exclusive control of the kitchen premises in which the fire originated. The kitchen was a large scale commercial enterprise, likely to accumulate hazardous quantities of grease and other highly combustible substances.

If all fire had been extinguished in the kitchen premises when the employees left, the evidence indicates no other cause for the fire's start: i. e., the conflagration was most reasonably caused by some fire (smouldering grease, or spark, or unextinguished flame fed by gas from the pilots) left alive in the premises when the employees locked up, for no other cause is even suggested by the evidence. Further, the evidence indicates that, if the extinguishing equipment worked as it should have, the fire could not have started or have spread so rapidly.

We thus conclude that the evidence as a whole proves the most reasonable cause of

control of the defendant. See Comment, 25 La.L.Rev. 748, 758 (footnote 57), listing eleven such decisions.

the fire to have been the defendant's insured's negligence in leaving fire alive on his premises, which contained inflammable substances. Having so concluded, we find it unnecessary to discuss other specific aspects of negligence indicated by the evidence: the inadequacy of the extinguishing equipment, the letting gas escape from the pilots during the night, the failure to have secured Fire Department approval for installation of the ductwork and extinguisher system, and the fire hazard of maintaining an open stairwell (which, though protected by a grandfather's clause from criminal prosecution as a violation of the municipal building code, may nevertheless have constituted an unreasonable hazard to the neighboring premises).

For this reason also, we find it unnecessary to discuss any possible liability of the insured by reason of the stricter duty owed by an occupier of premises to those on neighboring premises injured because of activities (the large-scale commercial kitchen and attendant risks) conducted by him on his land or because of the diffusion of noxious substances (smoke) from it. Civil Code Articles 667, 669, 2315; Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So. 2d 133 (1971); Chaney v. Travelers Insurance Co., 259 La. 1, 249 So.2d 181 (1971).

Therefore, we find that the plaintiffs are entitled to recover for the death of their father, which under the evidence was caused by the defendant's insured's negligence. However, as a matter of present preferable policy, we usually do not fix quantum where neither the trial nor the intermediate court has passed upon this question. See, e. g., Nelson v. Zurich Insurance Co., 247 La. 438, 172 So.2d 70 (1965). See also: Smith v. Hartford Accident and Indemnity Co., 254 La. 341, 223 So.2d 826 (1969). Instead, we remand the proceedings for such purpose.

*Decree*

For the reasons assigned, the judgments of the district court and of the Court of Appeal, Fourth Circuit, are reversed insofar as they dismiss the demand of the plaintiffs. The case is remanded to the Court of Appeal, Fourth Circuit, in order that it may fix the damages to which the said plaintiffs are entitled for the wrongful death of this decedent; and for such court to render judgment for their sum against the defendant, The American Insurance Company. All costs are to be borne by this defendant.

Reversed and remanded.

HAMLIN, J., dissents, adhering to the views expressed with original opinion.

DIXON, Justice (dissenting).

I respectfully dissent. We seem to hold that fire of an unexplained origin makes the occupant of the burned premises liable for damages to others harmed by the fire. Causes of fire are too numerous and mys-

terious. No great policy reason exists to force this court to saddle an unfortunate fire victim with this additional liability. It is only recently that this court has approved judgments for plaintiffs in damage suits on "probabilities."