LEMMON, Judge.
Mr. and Mrs. Tillman Scott filed this suit to recover damages for injuries sustained when Mrs. Scott jumped from a second story window during a fire in their apartment building. Defendants are the apartment building owner and his insurer, the real estate firm which managed the property, and the gas company which provided utility service to the building. After a trial on the merits the trial court dismissed the Scotts’ action against all defendants, and the Scotts appealed.
The apartment building was a raised double cottage, divided into three apartments as shown on the following annotated exhibit:

The Scotts occupied Apartment No. 1411. In the basement ceiling near the rear of the garage was a floor furnace, which heated Apartment No. 1409 and which was alleged to be the cause of the fire.
Mr. Scott discovered the midafternoon fire and awoke his wife from a nap, but they were prevented by flames from reaching the front stairway. When they attempted to exit through the kitchen, they found the interior stairway filled with *761 smoke and saw flames coming from the other side of the stairway partition (from the basement under No. 1409). Believing that this stairway was also on fire, they went to the back bedroom and jumped from a second story window.
Uncontroverted evidence established that the fire started in the garage and basement. The Scotts attempted to prove that the fire was caused by a natural gas leak in the floor furnace which served No. 1409. The Scotts, however, could not themselves give any direct evidence as to a leak in that apartment and had never smelled a gas odor in the basement.
James Bramlett, who had moved out of No. 1409 on March 28, 1969, testified that he had smelled gas fumes while the floor furnace'was operating, but had not detected any odors when the furnace was off. At' his request the then landlord had her plumber check and regulate the furnace. The same plumber had annually inspected the heating system in the building.
The present owner purchased the building on April 21, 1969. Mr. and Mrs. Fred Bell and their family moved into No. 1409 on April 25, 1969, six weeks before the June 7 fire. Mr. Bell testified that he detected a gas odor about two weeks after he moved in, that he thought the heating system was on because he heard the thermostat clicking, that upon investigating the floor furnace he smelled gas and saw a pilot light burning, and that he told his wife to report the odor to the property management firm.
Mrs. Bell testified that she smelled gas in the area of the floor furnace and reported this by telephone twice to the property management firm. However, she never reported the odor to the utility company, nor did she call a plumber or heating serviceman. She also stated that the prior tenant, Bramlett, who returned to visit his sister in the lower apartment, had at her request turned off the floor furnace two or three weeks after the Bells moved in. Bramlett verified this, stating that Mrs. Bell had complained of the heat.
The Bells’ daughter testified that she smelled gas in the apartment, the strongest odor being in the dining room. None of the Bells ever smelled gas in the basement, although they spent much time there.
On the other hand, the property management firm had no record of a complaint about a gas leak, although their records showed the Bells had made two other complaints during the six weeks they lived there.[1] Furthermore, Mrs. Bell went to the firm’s office five times to pay her rent and admitted that she never complained of a gas leak on these visits.
The utility company, which had no record of any complaints during the pertinent period, had checked the meters when the Bells moved in and also when Bram-lett’s sister moved out of the lower apartment three weeks prior to the fire, and had found no leaks.
The property manager completely inspected the apartment during the Bells’ occupancy and did not notice a gas odor, nor did the Bells complain to him of one.
Mrs. Bell and her daughter testified that the flames in their apartment came from the floor above the garage and basement. Examination of the building after the fire revealed that the plywood wall between the front garage and the rest of the basement had completely burned. The studs on the garage side wall were charred from the floor to the ceiling, and carbon deposits stained the floor. Near the plywood wall, the side walls of the basement behind the garage were charred from about two feet above the floor to the ceiling.
A fire investigator from the Fire Department concluded that the fire started “in the area, underneath” the floor *762 furnace.[2] He stated his belief that at one time during the fire there was an acceler-ant feeding the fire, which could have been the floor furnace, the gas meters after the seals burst, or gasoline fumes from a can in the basement, all of which were located in the general area where the greatest damage occurred.[3] On cross examination the investigator identified a sequence of photographs taken during the period of heaviest burning, explained the “flashing over” of the vapors given off by the decomposing wood, and admitted this flashing over could cause the accelerant appearance to which he referred.
A chemical engineer from a testing laboratory qualified as an expert in fire investigation. He examined the numerous photographs and inspected the building about one month after the fire (after repairs had begun). He noted that the wall studs in the area of greatest damage had burned all the way down to the floor, particularly in the front garage where the gasoline can was found. Based on the fact of the low burn and the evidence of liquid hydrocarbon stain on the floor, he opined that the source of ignition was close to the floor. He did not believe a natural gas leak in the basement ceiling was a cause of the fire, because of the low burn and the liquid hydrocarbon stains, and because natural gas from a leak in the furnace would probably have risen through the open grate into the upper apartment.
At the time the fire broke out, two young Bell children were riding bicycles in the basement. One was badly burned about the legs and on his face.
Negligence, like any other fact, may be proved by circumstantial evidence. The circumstantial evidence requisite in civil negligence cases need not negate all other possible causes of injury. It suffices if the circumstantial proof excludes other reasonable hypotheses only with a fair amount of certainty, so that it be more probable than not that the harm was caused by the tortious conduct of the defendant. Naquin v. Marquette Cas. Co., 244 La. 569, 153 So.2d 395 (1963); Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972).
From the testimony and the numerous photographs in the present case, we conclude, as did the trial judge, that the Scotts failed to establish by a preponderance of the evidence the fact that there was a natural gas leak or other defect in the premises, or to establish the inference that a premises defect or other act or omission by the defendants, rather than some factor for which the defendants were not responsible, was the more probable cause of the fire.
STATUTORY VIOLATION
The Scotts additionally contend that the injury occurred because the interior stairway of the property did not conform to statutory requirements relative to fire prevention and protection.
Chapter 7 of Title 40 of the Revised Statutes is entitled Fire Prevention or Protection. In Part III of the chapter, R.S. 40:1580 requires that “Every structure * * * shall have at least two exits, each remote from the other and accessible to all occupants of each floor level.” R.S. 40:1585 (B) lists the specifications for interior exit stairways, of which the following are pertinent:
“B. Where interior stairways are provided as the means of egress from any structure, watercraft or movable in case of fire or panic, those stairways shall conform to the following:
“(1) The stairways shall be fully closed in fire partitions with fire doors. Both the partitions and doors shall have a minimum of one hour fire resistance.

*763 “(4) Stair enclosures shall be ventilated at the top.
* * * * * *
“(6) Stairs shall be so located as to provide uninterrupted egress at the ground floor level to the outside, * * * ”
It is undisputed that the stairway was not fully closed in fire partitions with fire doors, that there was no stair enclosure ventilated at the top and that the stairs were not located so as to provide uninterrupted egress at the ground level to the outside.
The building .owner and his insurer, however, contend that the cited statutes do not apply to this particular building. They rely on R.S. 40:1584(D)(5) and (6), which exclude lodging houses containing less than 4,000 square feet (D) (5) and three family apartment houses (D)(6) from complying with portions of Section 1584.
Since the cited exclusions only excuse compliance with Section 1584, and since Section 1585 was the pertinent statute violated, the argument regarding these exclusions is of no avail. Furthermore, the fact that the exclusions from Section 1584 are particularized as to that section indicates that the other sections of Part III apply to the structures specifically excluded from Section 1584 of Part III.[4]
The owner and his insurer also argue that R.S. 40:1580, which requires two exits, places exit arrangement within the discretion of the fire marshall when “it is impossible due to physical conditions in existing buildings to secure two means of egress.” This argument is without merit. It was not impossible to secure two means of egress in this case; there were in fact two means of egress. The violation consisted of the failure of the second exit to meet the safety specifications required of interior stairways by another statute, Section 1585.
The same reasoning applies to the owner’s argument that compliance with the Building Exits Code must be deemed full compliance with Section 1580’s requirements as to exits.
We therefore conclude that R.S. 40:1585 was applicable to this building and that if the statutory violations were the legal cause of any injury to plaintiffs, the building owner and his insurer are liable to respond in damages.
We determine legal cause by first determining whether the act complained of was a substantial factor in causing the injury, then by determining what duty was imposed and whether the risk created by a breach of that duty was one for which the statute intended to offer protection, and finally by determining whether there was a breach of that duty. Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970).
To be a cause-in-fact, the act or omission must be a substantial factor without which the injury would not have occurred. Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714 (1972). Stated otherwise in the present case, the owner’s violation of duty should be deemed a substantial factor in causing the injury if compliance with the statutory duty would have prevented the injury.
R.S. 40:1585 was designed in part to provide an escape route for fire victims from an upper floor directly to the outside at ground level, protected for a reasonable period of time from the smoke and flames which might hinder escape by means of an open stairway. The huge accumulation of trapped smoke in the area of the stairway and the flame on the other side of the partition dividing the basement led the Scotts to reasonably believe they could not safely escape by means of the interior stairs. Yet these stairs suffered no fire damage whatsoever. Furthermore, the Scotts reached the kitchen entrance to this stair *764 way almost immediately after the fire broke out.
Had the stairway been enclosed, it is reasonably probable that the huge accumulation of smoke would not have developed on the stairway and obstructed the Scotts’ view of the true situation. Ventilation of an enclosed stairway should have further deterred the trapping and accumulation of smoke in the area. Additionally, a one hour fire resistant enclosure should have hindered the development of smoke and fire from the other side of the basement, at least until the time that the Scotts attempted to use this exit.
Casual connection must be determined according to the facts and circumstances of each case. Here, in view of the facts that no fire damage occurred in the area of the stairs and that the Scotts quickly reached the safe stairway, it is reasonably probable that a properly enclosed and ventilated stairway with uninterrupted egress to the outside would have allowed the Scotts to escape safely. This is the reverse situation from the case of Lee v. Carwile, 168 So.2d 469 (La.App. 3rd Cir. 1964), in which the owner’s compliance with his duty would not reasonably have prevented the fire victim’s injury.
We conclude in the present case that compliance with interior stairway specifications would in reasonable probability have prevented the necessity of Mrs. Scott’s jump. Accordingly, we hold that the owner’s breach of his duty to provide an interior stairway which conformed to specifications was a substantial factor in causing Mrs. Scott’s injuries.
We further believe that the owner’s breach of his duty to conform to the fire protection specifications created one of the exact risks for which the statute was designed to offer protection, namely, that the smoke and flames from other areas of the building would hamper or deter the use of an open stairway in an area of the building away from the fire itself.
Inasmuch as we have determined (1) the owner’s dereliction was a substantial factor in causing the accident, (2) a statute imposed a duty upon him to enclose the stairway with proper doors and ventilation at the top and to provide uninterrupted egress at ground level to the outside, (3) he breached that duty, and (4) his breach created a risk which was within the scope of protection intended by the statute, we conclude that the owner is liable for Mrs. Scott’s damages resulting from the unavailability of an enclosed stairway leading directly to the outside.
QUANTUM
Mrs. Scott was taken to Charity Hospital emergency room after the June 7 fire. The hospital records show her injuries were diagnosed as “Possible pelvic fx. R/O (rule out) Bladder Trauma.”[5] She testified she returned three days later, complaining of pain in the back, pelvis and lower right leg, and then returned every week or two thereafter. There were no further entries in the hospital records, however, until August 15, when she complained of swelling in her right ankle.
These later records disclosed a notation that doctors found two lesions of the tibia. The final diagnosis, following surgery and two extended periods of hospitalization, was a bone infarct. The notation, however, attributed the bone infarct to Mrs. Scott’s sickle cell trait.
A general physician (who had been an intern at the hospital during Mrs. Scott’s confinement) opined that the infarct existed long before the fire, but stated in answer to a hypothetical question that severe trauma can cause an asymptomatic infarct to be symptomatic.
An orthopedic surgeon, who had extensive experience with sickle cell diseases, examined Mrs. Scott about five weeks aft *765 er the fire. He found moderate lumbo-sacral spasm, a minimally angulated fracture of the rib, and a sprained and mildly swollen ankle, all of recent origin. He also determined the existence of the bone infarct, which he attributed to the sickle cell trait. However, he expressed his firm opinion that Mrs. Scott’s soft tissue injury was not sufficient to cause activation of an asymptomatic bone infarct, adding that even a fracture would not change the condition significantly.[6]
When the orthopedic surgeon again examined Mrs. Scott over a year later, he found no residual problems relating to the back and rib injuries.
A second orthopedic surgeon examined Mrs. Scott within a month after the fire, at defendant’s request. His findings and diagnosis as to soft tissue problems were substantially the same as those of the other specialist. He was unaware of Mrs. Scott’s sickle cell trait or her tibia lesions.
Mrs. Scott moreover admitted that she told an insurance adjustor three days after the accident that her only injury was in the pelvic area.
The trial judge, although finding no liability, expressed his impression that Mrs. Scott failed to prove the fall caused or aggravated her sickle cell trait. After reviewing the record, we conclude the Scotts have failed to bear their burden of proof in this regard.
The evidence did reasonably connect Mrs. Scott’s fractured rib, sprained ankle and lumbosacral strain with her jump from the burning building. However, the record only established that these injuries were still symptomatic five weeks after the fire and were no longer symptomatic one year later. We must therefore assume that the residual suffering cleared up within a reasonable time after the five-week examination. Under these circumstances we believe an award in the amount of $2,000.00 will adequately compensate Mrs. Scott for these injuries.
As to loss of wages, Mrs. Scott testified she was unable to operate her laundry pressing machine because of her leg and ankle problems. Since there was no medical or lay evidence as to the duration of disability from the sprained ankle, we have no basis on which to make an award beyond five weeks. We accordingly set the award for loss of wages at $200.00 (five weeks at approximately $40.00 per week.)
The only medical expenses proved to be caused by the jump were the Charity Hospital emergency room bill ($24.00) and the orthopedic specialist’s first examination ($112.50).
DECREE
The judgment of the trial court is reversed in part, and it is now ordered that judgment be rendered against George Nus-loch and United States Fidelity & Guaranty Company, and in favor of Mr. and Mrs. Tillman Scott in the sum of $2,336.50, together with legal interest from the date of judicial demand and all costs of these proceedings, including expert fees of $100.00 to Dr. Dexter A. Gary and $75.00 to Dr. Ray J. Haddad, Jr.
In all other respects, the judgment is affirmed.
Affirmed in part reversed and rendered in part.
GULOTTA, J., dissents and assigns reasons.

. The Bells verified these complaints, relating to a toilet and to a leaking faucet, and the imediate repairs.

. He officially reported that the fire was of undetermined origin.

. There was contradictory evidence as to whether or not the can contained gasoline.

. See also R.S. 40:1573, which defines “structure” (as generally used in Part III) as “any building or structure of any nature or kind whatsoever except the interior of a single private dwelling.” (Emphasis supplied.)

. The record indicates she struck her side on a fence when she landed.

. We additionally note that the soft tissue injury was to the ankle and the infarct occurred in the tibia.