294 So.2d 564 (1974)
HANOVER INSURANCE COMPANY et al.
v.
JACOBSON-YOUNG, INC., et al.
No. 5509.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 1974.
Rehearing Denied June 6, 1974.
*565 Bienvenu & Culver, Ernest L. O'Bannon and Leonard A. Young, New Orleans, for plaintiffs-appellants.
Shushan, Meyer, Jackson, McPherson & Herzog, Donald A. Meyer, New Orleans, for defendant-appellee.
Stephen L. Huber, New Orleans, for defendants-appellees.
Before LEMMON, BOUTALL and SCHOTT, JJ.
LEMMON, Judge.
This tort suit seeks recovery of fire damage to a leased building.
Plaintiffs, the subrogated insurers of the building owner, sued the lessee, Jacobson-Young, Inc., several of its employees, and its insurer. In their petition plaintiffs alleged specific acts of negligence, as well as the applicability of res ipsa loquitur. From a judgment dismissing the action after a trial on the merits, plaintiffs perfected this appeal.
The principal issue in this court is whether plaintiffs' circumstantial evidence established the probability that Jacobson-Young's employees' negligence, rather than some other factor, was the cause of the fire. Additional issues are quantum and insurance coverage.
The fire occurred in a metal-clad building, which was used as an automobile paint and body shop. The building consisted of seven open repair bays and an enclosed eighth bay, which was used as a paint spray booth. Only employees were admitted into the building, and no smoking was permitted inside the building.
In the open bay next to the spray booth was a paint bench, about seven feet long. Paints, thinners, lacquers and other painting materials were kept on a shelf beneath the paint bench and on a wall shelf above the bench.
The service manager testified that just before the fire he spoke to the painter, who was mixing at the paint bench; that no one else was in the area of the bench; that as he walked away, the fire broke out; and that he turned around and saw the wall behind the paint bench on fire.
*566 The painter was the only person who handled paint in the building. He testified as follows:
"Q. When did you first notice the fire; what did you first notice about the fire?
A. I noticed a blaze. I turned around and I looked and I seen a blaze in the corner by the paint bench. I was on one end, the fire was on the other end.
Q. Did you hear anything, did you see anything? Where was the blaze coming from?
A. Come from on the side by the paint bench.
Q. What was burning?
A. At that time, I don't know. I wasn't paying attention what was burning. When you see a fire you don't hardly look what's burning, you look to see something to put it out.
Q. The concrete floor wasn't burning, was it?
A. I didn't say the concrete floor was burning, you said that.
Q. I asked you what was burning.
A. I don't know.
Q. You saw a flame, and then what?
A. I ran and tried to get a fire extinguisher, tried to put it out.
THE COURT:
You said the fire was coming from the opposite end of the bench from you?
THE WITNESS:
I was at the left side of the bench and the fire was coming from the right side.
THE COURT:
About how far away was that from you?
THE WITNESS:
Not far, a couple of feet, not very far.
BY MR. YOUNG:
Q. There was nobody else in that area but yourself?
A. That's all.
Q. Was there an electric sander lying on the floor in that area?
A. Yes, it was.
Q. Was it plugged in?
A. I don't know, I wasn't paying attention to it. The man had just finished using it a few minutes ago; I don't know if he left it plugged in.
Q. Who was that?
A. Walker.
Q. He just got through using it a few minutes before?
A. Maybe an hour or so, maybe less, I didn't pay attention to how much time it was.

* * * * * *
Q. I wish you would explain one more time exactly whereyou were the person that was standing at the bench; where was this fire when you saw it?
A. Closest thing I can tell you where the fire was, on the right side of the bench.
Q. On the bench?
A. No, not the bench, in the corner from the bench. Now, where it started from, where it started at, I don't know. I really don't know how it started, but it was on the right side of the bench."
The painter also stated that a five gallon can of thinner was on the right side of the bench (where the fire started). Although at one point in his testimony he claimed *567 the fire broke out while he was breaking lumps of vinyl paint in the bottom of a can, a step necessary before thinner is added, he stated later in his testimony that the fire occurred as he was walking from the bench to spray a car top (from which we infer he had just used the thinner).
Other employees in the building stated that the fire started suddenly at the paint bench or the wall behind the bench. None of the employees, however, could explain the cause of the fire, although one testified he saw flames "around the floor, like paint was spilled" and was told by the painter that a spark from the grinding machine may have hit the paint bench. This employee also stated that grinding machines were constantly used in that area, although he did not specifically state that a grinder was in use at the time the fire broke out.
An inspector from the New Orleans Fire Department testified that paint vapors are volatile; that paints and thinners should be kept in metal containers in metal lockers; that all inside painting should be done in spray booths with filtering systems for removal of vapors; that Jacobson-Young did not have these required safety features; and that the presence of vapors from paints and thinners, with an ignition source, can "create quite a fire." The inspector found 15 or 20 paint cans on the shelf and on the floor after the fire. About half of the cans had been substantially burned.
The trial judge denied recovery on the basis that plaintiffs failed to prove the cause of the fire or any negligence on the part of the defendants. We disagree, although even plaintiffs admit they did not prove negligent causation of the fire by direct evidence.
Negligence, like any other fact, may be proved by circumstantial evidence. Furthermore, the preponderance of circumstantial evidence required in civil negligence cases need not negate all other possible causes of the casualty. Proof by either direct or circumstantial evidence is sufficient to constitute a preponderance when the proof, taken as a whole, shows that the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
Plaintiffs proved by the testimony of Jacobson-Young employees that paints, thinners and other volatile substances were stored in open areas, in close proximity to ignition sources such as a grinding machine which gave off sparks, and that some painting operations were performed in open bays. Plaintiffs further proved by the testimony of the Fire Department inspector that these practices violated fire prevention regulations. Plaintiffs therefore proved by direct evidence that Jacobson-Young employees were negligent in some operations conducted in the paint shop.
However, plaintiffs could not reasonably prove by direct evidence whether or not this employee negligence caused or contributed to the fire. The facts necessary for direct proof were peculiarly within the knowledge of the paint shop employees, who were the only persons allowed in the paint shop and were in fact the only persons in the shop when the fire broke out. Plaintiffs therefore presented circumstantial evidence which they argue warrants the inference that employee negligence caused the fire.
Negligence is never presumed from the mere happening of an accident. The circumstances surrounding the happening, however, may justify the inference of negligence. Jones v. Shell Petroleum Corp., 185 La. 1067, 171 So. 447 (1936).
Plaintiff bears the burden of proving negligence by a preponderance of the evidence, direct or circumstantial. Nevertheless, plaintiff has successfully borne his burden when the evidence taken as a whole indicates that the defendant's negligence was the most plausible or likely cause of the casualty and that no other factor can as reasonably be ascribed as the *568 cause. Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972).
In the present case the occurrence of a fire did not of itself justify the inference of negligence, since fires can occur from many causes. However, the facts that a substantial fire broke out in an area where flammable materials were improperly stored in close proximity to ignition sources and that the blaze was immediately out of control raised an inference of negligent causation, in the absence of another explanation. This inference was strengthened by the additional fact that Jacobson-Young and its employees were responsible for conditions of safety and fire protection in the area, where no other persons were allowed. Finally, the fact that the conflagration was confined to the narrow area at the wall behind the paint bench reasonably excluded many other possible causes, such as those factors attributable to the lessor's responsibility of maintenance.
The attendent circumstances thus indicate the cause of the fire was in all likelihood a condition or factor of which Jacobson-Young's employees knew or should have known and for which they were responsible. They had a duty to use reasonable care to prevent fires. Something happened in the paint shop, occupied only by Jacobson-Young's employees and controlled by them, which caused a fire to break out at the wall next to the paint bench. Yet the painter, who was at the bench and was in the best position to explain the cause, failed to do so.
We do not imply that a plaintiff's burden in circumstantial evidence cases is either increased or lessened, if the explanation is more accessible to one party than the other. A plaintiff does not sustain his burden by proving he knew less about the case than the defendant; he makes out his case by showing sufficient circumstances which point the finger of suspicion at defendant to outweigh other possible explanations.
The inferences drawn from the situation existing between Jacobson-Young's employees and the breakout of the fire established the likelihood of employee negligence as the cause and left little room for the probability that another factor caused the casualty. We therefore conclude that the negligence of Jacobson-Young's employees, rather than some other cause, was the most plausible explanation of the occurrence, and accordingly hold Jacobson-Young, as their employer, liable for the damages sustained by plaintiffs' insured. However, since the evidence does not prove which employees were the actual tortfeasors, we affirm the dismissal of the action against the individual employees.

INSURANCE COVERAGE
Jacobson-Young was insured for bodily injury and property damage liability by a garage liability insurance policy. However, the insurer asserts that the policy specifically excluded this particular loss, in that the exclusions provided as follows:
"This insurance does not apply, under the Garage Liability Coverages:

* * * * * *
"(g) to property damage to
(1) property owned by, rented to or held for sale by the insured, * * *"
Clearly, since the damaged property was rented to the named insured, Jacobson-Young, that corporations' liability was excluded from coverage. Plaintiffs virtually concede this, but argue that the employees also qualified as persons insured under the policy and that the damaged property was not rented to any of Jacobson-Young's individual employees.
We do not reach the merits of this argument, inasmuch as we cannot conclude that the employees were persons insured under the policy. The pertinent policy provision is reproduced in full as follows:
PERSONS INSURED
Under the Garage Bodily Injury and Property Damage Liability Coverages *569 each of the following is an insured under this insurance to the extent set forth below:
(1) the named insured;

(2) with respect to garage operations other than the automobile hazard;

(a) any employee, director or stockholder of the named insured while acting within the scope of his duties as such,
(b) if the named insured is designated in the declarations as a partnership or joint venture, any partner or member thereof but only with respect to his liability as such,
(c) any person or organization having a financial interest in the garage operations of the named insured;

(3) with respect to the automobile hazard:

(a) any person while using, with the permission of the named insured, any automobile to which the insurance applies under the automobile hazard, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to bodily injury or property damage arising out of the loading or unloading of an automobile, such person shall be an insured only if he is:
(i) a borrower of the automobile, or
(ii) a partner, member or employee of the named insured or of such borrower;
(b) any other person or organization but only with respect to his or its liability because of acts or omissions of the named insured or an insured under (a) above.
None of the following is an insured:
(i) any person while engaged in the business of his employer with respect to bodily injury to any fellow employee of such person injured in the course of his employment;
(ii) any person or organization, other than the named insured or its directors, stockholders, partners, members or employees while acting within the scope of their duties as such, with respect to operations performed by independent contractors for the named insured;

(iii) any person or organization, other than the named insured, with respect to any automobile

(a) owned by such person or organization or by a member (other than the named insured) of the same household, or
(b) possession of which has been transferred to another by the named insured pursuant to an agreement of sale;
(iv) any partner, member or employee of the named insured or the spouse of such person, with respect to property damage to property owned by, rented to or held for sale by the named insured, or property in the care, custody or control of or transported by the named insured.

Jacobson-Young's insurer argues that sub-section (iv) disqualified the employees as persons insured. On the other hand, plaintiffs contend sub-section (iv) is a sub-sub-paragraph of section (3)(b), which applies only to the automobile hazard. Plaintiffs point out the system of sub-paragraphing proceeds from Arabic numerals in parentheses to small letters in parentheses, followed where necessary by small Roman numerals in parentheses.
We interpret the clause "None of the following is an insured" as intending to exclude all persons thereafter listed from qualifying as "Persons Insured", even if qualified as an omnibus insured under the first section of the provision. We therefore *570 view the clause as introducing a separate and distinct section under the title "Persons Insured." Regardless of the numbering method, we can find no relationship between Section (3) (b) and the exclusion of persons otherwise insured.
The apparent intention of sub-section (iv), moreover, is to preclude the exact coverage situation for which plaintiffs are arguing in this case and to provide that where a named insured's vicarious liability is excluded from coverage by exclusion (g)(1) as to damage to property owned by or rented to the named insured, the liability of the named insured's employees for damage to that same property is likewise excluded from coverage.
We accordingly conclude that Jacobson-Young's policy does not provide coverage for the loss incurred in the present case.

QUANTUM
Immediately after the fire, plaintiff's agent inspected the damage and obtained an estimate of the repair cost from the contractor who had originally built the building. The contractor, who was the distributor of that type of metal building, specified in detail, both in his estimate and in his subsequent testimony, the items which had to be replaced because of fire damage and the plumbing, electrical, painting, concrete and other repairs which were made necessary by the casualty.[1]
Plaintiffs' agent also obtained another bid on the repairs, which differed substantially from the first bid only as to the amount of the electrical subcontract. The original contractor then refigured the electrical work and submitted a reduced bid. On the basis of the last bid of $17,645.00, plaintiffs paid their insured after deducting 10% for depreciation of the seven year old building and the applicable policy deductibles.[2]
Plaintiffs' adjustor described the building as in good condition except for the fire damage. Jacobson-Young's service manager, himself a defendant, complained that the building was rusting and needed paint, that some doors didn't close well, and that the roof leaked, observing "they say the building was seven or eight years old, but it looked like it was about 40."
Defendants introduced the testimony of a civil engineer, who inspected the building more than three years after the fire. His testimony as to the fire damage was general and of little value. He did estimate a 12-year useful life for this type of building used as a paint and body shop, commenting that he noticed a "lot of damage was done to the building which seemed to be cars maybe bumping into the wall panels."
At defendants' request another contractor had inspected the building about 13 months after the fire. He also testified that a 12-year useful life could be expected for this type of use, although he admitted a much longer period would be expected for less rugged uses. Neither he nor the engineer knew the condition of the building prior to the fire.
This contractor had previously built four metal buildings, but had never repaired any (because "they all last"). He estimated the cost of repairing the fire damage at $6,879.00, plus the electrical work (figured by plaintiffs' experts at $3,000.00). However, whereas plaintiffs' expert contractor testified in detail as to all items of necessary replacement or repair and filed an itemized and priced take-off sheet, defendants' expert testified in general terms and did not particularize the necessary items of *571 repair or replacement, or the individual cost thereof.
After considering all of the evidence, we conclude that the estimate of $17,645.00 to repair the building was reasonable and should be used as the basis for awarding damages. However, we find the 10% adjustment figure used by plaintiffs' agent in proving the loss to be unreasonable in the light of the credibile evidence.
Damages for injury to property are awarded to restore the owner, as nearly as possible, to his position before the casualty occurred. When the property can be repaired, the usual measure of damages is the cost of the repairs. However, the value of the damaged property after repairs is often lesser or greater than its value prior to the casualty, and an adjustment to the actual cost of repairs is often necessary in fixing the total award of damages. For example, a wrecked late model automobile often has a lesser value after complete repairs than it had before the wreck, and the cost of repairs would not fully compensate the loss in property value. On the other hand, when (as in the present case) the property value will be substantially enhanced by the proposed repairs, an adjustment for the property's inferior value before the casualty should be applied to the cost of repairs in order to fairly measure the damages sustained by the owner.
In the present case the evidence established that, while the building deteriorated faster in use as a paint shop than it would have in a less severe use, and while there were perhaps unsightly dents in the metal and some rusting, there were no substantial structural or mechanical defects prior to the fire. Therefore, as to the largest items of repairthe plumbing and electrical work and the replacement of the warped girts, purlins, columns and wall and roof panelsthere was no tremendous value deficiency in the old building as compared to the building after the proposed repairs.
Under the evidence in this case we believe that a deduction of 25% from the cost of repairs is a fair adjustment.

DECREE
For these reasons, the judgment of the trial court is reversed in part, and it is now ordered that there be judgment against Jacobson-Young, Inc. and in favor of Hanover Insurance Company in the amount of $9,033.51,[3] Zurich Insurance Company of Switzerland in the amount of $355.46, Phoenix Insurance Company of Hartford in the amount of $808.64, and Insurance Company of North America in the amount of $3,119.05, together with legal interest from the date of judicial demand until paid, and for all costs of these proceedings. In all other respects, the judgment of the trial court is affirmed.
Affirmed in part, reversed and rendered in part.
NOTES
[1] He itemized the wall and roof panels, girts, purlins, columns, base angles, doors, windows, skylights, fans and ventilators which had to be replaced and estimated the cost of removal, as well as the cost of cleaning and painting the structural steel not to be replaced. The electrical, plumbing and painting estimates were itemized separately.
[2] No substantial structural repairs were performed, since the lease term was about to expire.
[3] The amount paid by plaintiffs to their insured has been reduced to reflect our increase in adjustment to the cost of repairs from 10% to 25%.