341 So.2d 564 (1976)
Verlina WELTON
v.
Dennis J. FALCON et al.
No. 7619.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1976.
Rehearing Denied January 12, 1977.
Writs Refused March 11, 1977.
*566 Daniel E. Becnel, Jr., Reserve, for plaintiff-appellee.
Reuter & Reuter, Arthur C. Reuter, Jr., New Orleans, for Dennis J. Falcon and Jefferson Truck Lines, Inc.
John J. Maxwell, Metairie, for State of Louisiana, Dept. of Highways.
Before LEMMON, MORIAL and BEER, JJ.
LEMMON, Judge.
Defendants Dennis Falcon and his employer have appealed from a judgment following a jury verdict which awarded plaintiff damages for injuries sustained in an intersectional collision. Issues on appeal include Falcon's negligence and causation, plaintiff's contributory negligence, the liability of the State of Louisiana, Department of Highways for a malfunctioning traffic signal, and excessiveness of the itemized damage award.
The accident occurred at 6:45 a.m. on a clear, dry October day at a two-highway intersection in Laplace. The signal light controlling traffic at the intersection was malfunctioning at the time. Falcon, traveling east on Highway 61 (Airline Highway) in a 55-foot long tractor-trailer unit which weighed 46,000 pounds including cargo, was faced with a flashing yellow light. Plaintiff, traveling north on Highway 44 (which became Highway 51 on the north side of the *567 intersection) in a Chevrolet automobile, was faced with a steady green light.[1]
At the intersection there were two 13-foot wide driving lanes for eastbound traffic on Highway 61, in addition to a left-turn lane cut into the neutral ground, while Highway 44 was a two-lane, two-way roadway. The right front of the truck struck the left side of the car broadside, and the two vehicles traveled together 130 feet on Highway 61 before coming to rest. At the point of impact the truck, which had been traveling in the right lane and had veered to the left prior to the collision, was straddling the center line of the two driving lanes on Highway 61. There was a 40-mile per hour speed limit zone on Highway 61 for at least 500 feet before the intersection.
Falcon's Negligence
Falcon testified that he was driving about 40 miles per hour and slowed when he first observed the flashing yellow light about 200 feet before the intersection (although he later estimated the distance at 500 feet). He observed plaintiff's car in a stopped position to his right, and when the car proceeded to cross the highway, he "hit (his) brakes with (his) foot as hard as (he) could hit them." While he first stated that he was 75 to 100 feet from the intersection and traveling 25 to 30 miles per hour when he saw plaintiff's car stopped and that he was "right there on the intersection" when plaintiff's "car come across", he eventually confirmed upon being confronted with deposition statements that he was "a couple of truck distances, lengths of the truck" (110 feet) from the intersection when he hit his brakes.[2] When asked if the brakes were locked continuously from the time of first application until the vehicles came to rest, Falcon answered, "I don't know exactly. It happened so fast". He estimated that his vehicle traveled 10 to 15 feet after impact, but declined to challenge the investigating officer's measurement of 130 feet.
Falcon, faced with a flashing yellow light, had only a qualified right of way and had a duty to "proceed through or past such a signal only with caution", a duty which suggests reduced speed and cautious lookout. See R.S. 32:234 A(2). This duty, however, was arguably reduced once Falcon observed plaintiff in a stopped position, because Falcon at that point was reasonable in believing that plaintiff was faced with a red light and would remain stopped.
Because of this reasoning and of the consideration that plaintiff's case as to Falcon's liability was based principally on excessive speed, our principal inquiry on review of the evidence as to Falcon's liability is whether the record contains evidence sufficient to support the jury's apparent finding that Falcon's excessive speed was a legal cause of the accident.
The physical facts surrounding the accident were analyzed by Dr. I. Robert Ehrlich, an engineer accepted as an accident reconstruction expert. Ehrlich estimated the speed of the tractor-trailer unit immediately after impact by calculating the energy of motion used up in braking from that point to the point where the unit came to a stop, 130 feet down the concrete roadway.
He applied the formula V = V-------
 2 u g S
(velocity in feet per second equals the square root of double the coefficient of friction, multiplied by the maximum rate of deceleration due to gravity, multiplied by *568 the skidding or braking distance).[3] The gravity factor, g, is a known constant (32.2 feet per second, which is the fastest rate at which an object can lose speed without encountering additional resistance), and the variable S was determined by reference to the officer's measurement of 130 feet. Ehrlich assigned 0.65 as the coefficient of friction for the truck tires on the concrete roadway, noting that this figure was lower than the numerical expression of 0.75 which he would have used for an automobile on that surface, because of the hard, highly inflated tires used by trucks. (He pointed out, however, that the friction of the automobile being pushed sideways would have an additional retarding force.) The calculation indicated a speed immediately after impact of 73.8 feet per second, or approximately 50 miles per hour.[4]
Although Ehrlich calculated Falcon's speed at other points prior to impact, this crucial determination that Falcon was exceeding 50 miles per hour immediately after impact makes relatively unimportant the determination of his speed at any earlier point.
In attacking Ehrlich's calculation of velocity immediately after impact, defendants did not challenge (either in cross-examination or by other expert testimony) the applicability of the formula used or the correctness of the coefficient of friction assigned. Rather, defendants attacked the calculation, both at trial and in argument in this court, on the basis that the evidence did not support a finding of a 130-foot braking distance.
Braking distance is the distance traveled while skidding or with maximum braking. The determination of braking distance properly includes consideration of all evidence of tires skidding on the road surface. Thus, our determination of whether the jury could attribute any weight to Ehrlich's testimony depends upon the evidence supporting the braking distance utilized in his calculation.
The investigating officer did not identify a constant line of skid marks from the tractor-trailer, but did find some skipping marks made by the unit's tires.
Ehrlich explained the effect of the absence of an identifiable line of constant skid marks, stating:
"There are skid marks. It seems like intermittent skid marks, as you very often find with trucks with hard highly inflated tires, as I made allowance for in the calculations."
* * * * * *
"Because of the hardness of the truck tires very often they don't leave skid marks. Truck tires are very hard whereas passenger car tires are very reasonably soft. Try and put your fingernail into a truck tire. You can't do it. You can do it in a passenger car. Truck tires are inflated to 80 to 100 PSI. That's very hard. Most gasoline stations, the highest the pumps go up to is 35 PSI. You couldn't even inflate it at a gasoline station." (Emphasis supplied)
Observing that a braking vehicle (particularly a large tractor-trailer unit with highly inflated tires) does not necessarily leave skid marks, Ehrlich noted that the important question is whether braking occurred over the entire 130-foot distance. (Obviously, if the tires rolled rather than skidded over any substantial part of that distance, the calculation was inaccurate). He was satisfied from Falcon's admission of applying his air brakes hard two truck lengths *569 before the intersection that wheel locking and braking began sometime prior to impact (although there was no evidence presented of skid marks prior to impact), since an air brake system with front brakes becomes locked as soon as the brakes are applied.
As to whether braking continued after initial application, Ehrlich noted that a driver, once he had "put his brakes on full", would hardly go "into an accident without his brakes on full unless he wants to hit somebody", and that it was highly improbable under such circumstances that the driver would release his brakes and allow the vehicle to move freely until all energy of motion was dissipated. In this respect we note that Falcon did not know whether he released the brakes before the vehicles came to rest and significantly did not deny continued application.
On this evidence the jury could reasonably have concluded (1) that Falcon's application of his brakes 110 feet prior to impact and his inability to bring the unit to a stop until he had traveled an additional 130 feet after impact indicates excessive speed and (2) that the absence of skid marks was adequately explained by Ehrlich. While reasonable men could very well have reached a different conclusion, we cannot say that the jury erred manifestly in reaching his conclusion on the evidence, particularly since there was no contradictory expert evidence.[5]
Ehrlich's testimony as to causation was also significant. He first calculated (using basically the same formula) that if the tractor-trailer unit had been traveling 40 miles per hour at impact, it could have braked to a stop in a distance of 82 feet. Then he opined that the accident would not have occurred as it did if the unit had been traveling within the posted speed limit.[6]
Accepting Ehrlich's calculation, we note that the tractor-trailer unit, if traveling at 40 miles per hour, could have stopped in 82 feet of braking, plus an additional 43 feet traveled at that speed during a ¾ -second reaction time, or 125 feet after the driver perceived the necessity to apply the brakes.[7] Using Falcon's own testimony that he at least began to apply his brakes about 110 feet before the intersection, we hold that the jury could reasonably have concluded from the evidence that if Falcon had been traveling within the posted speed limit, he could have almost stopped the unit prior to the point of collision.
In summary Falcon admitted he braked 110 feet before impact and declined to deny that he continued braking (while pushing plaintiff's car sideways) an additional 130 feet after impact. Therefore, the jury could reasonably have found, based primarily on Falcon's own testimony, (1) that Falcon's speed was much greater than 40 miles per hour when plaintiff moved into the intersection and (2) that if Falcon had been traveling within the speed limit, the accident would not have occurred as it did. We therefore affirm the jury's determination that Falcon's excessive speed was a legal cause of the accident.
*570 Plaintiff's Contributory Negligence
Plaintiff entered Highway 44 at a point one block from the intersection and observed that the light was green. As she approached the intersection, she slowed and then stopped, looking to her left and then to her right. Seeing no oncoming traffic, she then proceeded onto Airline Highway, where she was immediately struck.
The evidence that plaintiff had a green light is overwhelming. Because she had a green light, she had no duty to look down the highway to her left or to discover approaching traffic not yet within the intersection. Bourgeois v. Francois, 245 La. 875, 161 So.2d 750 (1964); Correge v. Webb, 284 So.2d 355 (La.App. 4th Cir. 1973), cert. den. 286 So.2d 664.
Defendants argue, however, that plaintiff's act of stopping at the intersection and looking for oncoming traffic imposed a duty upon her to discover the approaching truck. This is a miscomprehension of the theory of legal duty. Because a motorist who does not have the right of way at an intersection has a duty both to look and to discover traffic approaching on the favored road before entering the intersection, he is liable for an ensuing collision if he looks but does not discover approaching traffic, since he fulfilled only a portion of his duty.
In the present case, however, plaintiff had the right of way because of a green light. She had no duty to look for or to discover vehicles approaching the intersection, since she could legally rely on crossing traffic to be faced with a red light. She was obliged only to look for and yield to crossing vehicles if they were already lawfully within the intersection. R.S. 32:232(1)(a).
While plaintiff's act of stopping may have misled Falcon into not slowing from his excessive speed, that act at most could be considered a cause-in-fact of the accident. However, liability does not flow from every cause-in-fact of an accident, but only from those which involve violation of a duty. Thus, while plaintiff may have owed a duty to a motorist following behind her not to stop at a green light, she owed no such duty to a speeding motorist approaching the intersection from a different highway, and her act of stopping did not constitute a violation of duty to that motorist. Furthermore, plaintiff's act of looking to her left when faced with a green light did not create a duty to discover vehicles not lawfully in the intersection, where no such duty otherwise existed.
Perhaps if plaintiff had actually discovered the approaching truck, our evaluation of the reasonableness of her conduct would be different. But tort liability is founded on violation of a duty, and we decline to impose liability here on a motorist because she failed to discover what she had no duty to discover.
Liability of Department of Highways
The evidence overwhelmingly established that the traffic light signaled green for plaintiff and flashing yellow for Falcon. Since more probably than not the accident would not have occurred if the signal light had operated properly, the malfunction was a cause-in-fact of the accident. Vidrine v. General Fire and Cas. Co., 168 So.2d 449 (La.App. 3rd Cir. 1964). The critical question is whether the Department was responsible for the signal's failure to operate properly.
Ten days before the accident the same signal light had stuck, and Department employees reported they "replaced a 658 controller and dual left turn control" and reset and checked the timing. Seven hours before the accident the light went out completely, and Department employees replaced a broken wire in the disconnect hanger, thereafter resetting the breaker and checking the operation.
After the accident a repairman found that relays in the 658 controller had gone bad, causing the lights to stick, and he replaced the controller. There was no investigation of the defect in the controller, which was sent to Baton Rouge for repairs.
*571 The Department contends that it did not cause the defect, and that since it received no notice of the specific malfunction prior to the accident, it cannot be held liable for failing to repair a malfunction of which it was not aware.
The Department, of course, should not be held responsible for all signal light malfunctions. For example, the evidence in this case indicates that the signal's being completely out seven hours before the accident resulted from a high object striking the disconnect hanger, causing a wire to break. Thus, the cause of that malfunction was perhaps the act of a third party.
However, the malfunction which contributed to this accident was caused by a defect in the controller. There is no suggestion that this defect is attributable to a third party. Furthermore, although malfunctions in mechanical equipment admittedly occur in the absence of negligence, the circumstance that the defective controller had been installed only ten days earlier and supposedly checked seven hours earlier strongly indicates that the controller either was improperly installed or checked, or was defective when installed. Since the Department maintains, repairs and installs controllers and other integral parts of the signal, defects due to improper maintenance, repairs or installations are reasonably attributable to the Department.
In a tort case found on negligence a plaintiff must prove negligence and causation by a preponderance of the evidence, direct and circumstantial. The plaintiff has successfully borne this burden when the evidence taken as a whole indicates that the particular defendant's negligence was the most plausible or likely cause of the casualty and that no other factor can as reasonably be ascribed as the cause. Boudreaux v. American Ins. Co., 264 So.2d 621 (La. 1972); Hanover Ins. Co. v. Jacobson-Young, 294 So.2d 564 (La.App. 4th Cir. 1974).
In the present case the most plausible explanation of the malfunction was defective maintenance. Since the malfunction was a cause-in-fact of the accident, we conclude that the Department's failure to properly maintain the signal light was a concurrent legal cause of the accident.[8]
Damages
In the October 8, 1974 accident plaintiff sustained multiple displaced fractures of the ribs on the left from the third rib through the eighth, two fractures of the pelvis, one fracture of the tibia and two of the fibula, a brain concussion, lacerations of the scalp, fractured and dislocated toes, a crushed heel bone, and multiple soft tissue, tendon and muscle injuries of the leg and foot. Reduction of the fractures and debridement were accomplished under general anesthetic.
Plaintiff's hospitalization lasted two months. During this period two additional surgical procedures were performed, one to debride additional dead tissue in the foot and ankle and the other to graft skin onto that area. She was in a cast thereafter for an additional five months, and at time of trial one year after the accident she was still using crutches.
Plaintiff stated that she cried and screamed with pain in the hospital and that since her discharge she has had constant pain in her foot and leg and daily headaches.
The attending physician, a hospital resident in orthopedic surgery, testified that at time of trial plaintiff's foot was swollen, that her ankle had no motion whatsoever and that it was "highly unlikely" she would ever walk without pain or would ever have *572 functional use of the foot and ankle. At plaintiff's last scheduled visit he suggested amputation below the knee to alleviate the pain, since the extremity was essentially useless.[9]
At the time of the accident plaintiff was 51 years old and had a life expectancy of 26 years. She had been divorced for 22 years and had supported herself by constant employment.
The jury awarded plaintiff $300,000.00 in general damages. After reviewing the record and the evidence apparently accepted as credible by the jury, we cannot say that this substantial award is an abuse of the much discretion conferred by C.C. art. 1934(3).
As to future medical expenses, the doctor estimated $756.00 in surgical fees and ten days of hospitalization in connection with the amputation.[10] He also estimated the cost of an artificial limb at $650.00, to be replaced every three years. An expert in actuarial science calculated $4,385.00 as the present value of a fund which would pay $650.00 every three years and $25.00 (for medical examinations) every two years over a period of 26 years. Since there is no other evidence of medical expenses, we must reduce the jury award of $75,000.00 for that item of damages to $5,141.00.
Plaintiff's earnings prior to the accident were shown to be $360.00 per month for the 17-month period ending April, 1974 and thereafter to be $300.00 per month, plus $50.00 per week at a second job. The actuarial expert also calculated that a present fund of approximately $53,000.00 would be required to pay $360.00 per month over a period of 14 years and one month (plaintiff's work-life expectancy), if that fund earned 5½ interest and was exhausted at the end of the period.[11] He applied a factor of 2½ per year for periodic salary increases, but did not apply an inflation factor, nor did he consider the fact that income tax must be paid on earnings.
The jury awarded $65,000.00 for loss of wages and of earning capacity. This loss, of course, cannot be computed with mathematical certainty, although the calculations of the actuarial expert merit substantial consideration by the trier of fact. Other appropriate factors for consideration include plaintiff's condition prior to the accident, her work record and amount of earnings in previous years, and the probability of her earning similar wages over the remainder of her work life except for the injury. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (La.1968).
Here, the actuarial expert performed several calculations to estimate the present value of plaintiff's impaired earning capacity (and those using lower interest rates indicated a higher value). However, on the calculation deemed appropriate by the expert, the value was $53,000.00. Since the jury's award was significantly higher than the value advanced by plaintiff's own expert, we conclude that this record does not support the higher award and reduce the amount of the judgment for this item of damages to $50,000.00.
Expert Fees
Defendants finally contended that the trial court abused its discretion in fixing expert fees.
R.S. 13:3666 authorizes additional compensation for witnesses called to testify to an opinion founded on special study or experience in any branch of science, or to *573 make scientific or professional examinations and to state the results thereof. The expert need not answer hypothetical questions in stating opinions and conclusions, but he is not entitled to a fee if he merely gives testimony as to facts and circumstances which could be stated by a lay witness.
The sum of $100.00 was awarded to each of the three investigating officers who testified. Deputies Nuncio and Gray, although qualified as "experts" in accident investigation, testified solely as to facts and were not asked to give opinion evidence.[12] Trooper Aubert's only stated "opinion" was the point of impact, which in effect was nothing more than an identification of the place where he found scuff marks and debris.
We must set aside the fixing of the fees for these witnesses, whose testimony required no greater expertise than that possessed by a lay person. We acknowledge the compelling argument advanced by plaintiff and others that officers who perform a substantial number of investigations should be compensated for their appearance in court when off duty. This is a problem, however, which addresses itself to the employing agency or to the legislature. The present statute authorizing compensation for expert witnesses simply does not offer the solution for this problem or comprehend compensation for this type of testimony.
Ernest Huval, the actuarial expert, was awarded $1,000.00, although he testified that he had charged only $200.00 for the court appearance and $200.00 for his examination and analysis of the facts and his calculation, plus travel expenses from Baton Rouge of about $25.00. While great discretion is accorded the trial judge in awarding expert fees, the award to the litigant cannot exceed the amount charged the party by the expert. Accordingly, we must reduce the award to $425.00.
Dr. Clark Gunderson, the orthopedic resident, was also awarded $1,000.00. He testified that he left New Orleans for the trial in Edgard at noon and estimated that he would reach New Orleans on the return trip at about 6:00 p.m. However, he lost no time from his scheduled work at Charity Hospital, having made up the hours at another time, and he was not scheduled that day to be at his private practice clinic.
We acknowledge the substantial problem of presenting expert medical testimony at a trial in a rural parish and are disinclined to reduce reasonable fees charged by medical experts who testify at such trials or to exclude from consideration for compensation the time spent by the expert in traveling to and from the courthouse. This doctor, however, did not state the fee that he charged, and the evidence to support the fee which plaintiff requested the court to fix did not indicate that such a substantial fee was in order. Furthermore, the doctor admitted he suffered no economic loss. Accordingly, we reduce the fee to $250.00.
Finally, Dr. Ehrlich, the accident reconstruction expert, was awarded $1,000.00. He testified that his fee was $400.00 per day away from his New Jersey home (as compared to $300.00 there) in addition to $230.00 for travel and hotel expenses. He spent one day in preparation and part of one day in court.
A litigant need not use local expert witnesses, but is not entitled to additional fees if he uses out-of-state experts where local ones are available. In such a case the court should set the expert fee according to the standard of the fee charged by local experts, and the litigant who chooses non-local experts must pay the difference.
*574 In this case we will allow one day for preparation and one day for court appearance at $300.00 per day.
Decree
For these reasons, that portion of the judgment of the trial court which dismissed the State of Louisiana, Department of Highways, is reversed, and it is now ordered that judgment be rendered on the third party demand in favor of defendants Dennis J. Falcon and Jefferson Truck Lines, Inc. and against the State of Louisiana, Department of Highways, granting judgment over against the third party defendant for contribution.
The judgment of the trial court is further amended so as to decrease the award to plaintiff to the sum of $355,141.00 and to recast the award of expert fees as follows:

Mr. Ernest Huval $425.00
Dr. Clark Gunderson $250.00
Dr. I. Robert Ehrlich $600.00

As modified and amended, the judgment is affirmed.[13]
REVERSED IN PART AND RENDERED, AMENDED AND AFFIRMED IN PART.
BEER, J., dissents and assigns reasons.
BEER, Judge, dissenting.
I respectfully dissent.
Mrs. Welton came to a full stop and was able to see "a great distance up the road" before proceeding into the intersection and being struck.
This unusual action, at an intersection where she had a clear signal to proceed by reason of a green traffic signal, caused her to be the unwitting victim of her own misplaced caution. Her unexplained decision to completely disregard the green traffic signal and to proceed in the unusual manner that she has described in her own testimony was, I believe, a cause in fact of the accident. Her decision to come to a full stop when she was being signalled to proceed set in motion a sequence of bizarre and unfortunate events that has culminated in her serious and permanent injury. She unintentionally but nevertheless clearly misled the oncoming driver, Falcon, who, under the circumstances confronting him, had solid reason to believe that the traffic signal light that controlled Mrs. Welton's movements was showing her a red signal. Thus, the combination of circumstances confronting Falcon as he proceeded toward the intersection were such that it would be unreasonable to require him to reduce his rate of speed. Furthermore, the record does not, in my view, support the expert testimony with regard to alleged excessive speed on the part of Falcon.
This was a most unfortunate accident involving a lady for whom all must have respect and compassion. Also, it seems to me that she has been entirely truthful in her testimony.
Nevertheless, I feel compelled to respectfully dissent for the reasons noted above.
NOTES
[1] While the Department's expert in maintenance and operation of traffic signals opined that it was impossible for a green light to show in one direction at the same time a yellow light showed in the other, a deputy sheriff had just observed the entire situation and was reporting the malfunction when the collision occurred. Other witnesses corroborated the deputy's testimony, and there was no conflicting eye witness testimony.
[2] We do not by this quotation mean to attribute unwarranted certitude to the deposition estimates. We simply note the later testimony, which is obviously more accurate. If plaintiff took approximately two seconds to move from the stopped position to the point of impact (as established by expert testimony conceded to be correct on that point), then Falcon had to be some distance (depending on speed) back from the intersection when plaintiff's car began to come across.
[3] This basic formula for estimating speed from braking distance applies when the road is straight and level and the decelerating vehicle has not struck another object. 1 Lacy, Scientific Automobile Accident Reconstruction, Ch. 6, p. 581 (1964, 1975). The same formula was applied by Ehrlich in the present situation (after impact) to determine the speed of the truck immediately after impact by reference to the "distance from the point that you're interested in to when it stops."
[4] Ehrlich also calculated that the velocity of the 46,000-pound tractor-trailer was slowed about three miles per hour by impact with the 3,800-pound automobile, indicating a speed immediately before impact of about 53 miles per hour.
[5] We are impressed, as apparently was the jury, by Ehrlich's qualifications, including his Ph.D. degree in engineering, his position as Dean of Research at Stevens Institute of Technology, his extensive list of technical publications, and his experience in accident reconstruction both on behalf of large manufacturing companies and of tort victims.
[6] This testimony also demonstrates that any after-impact braking distance greater than 82 feet would indicate an impact speed greater than 40 miles per hour.
[7] Defendants' brief challenged Ehrlich's statement that the weight of the vehicle does not affect braking distance. Since the mass pushing forward on braking is equal to the mass pushing downward, the mass factor cancels out in the equation. (1 Lacy, supra, Ch. 6, pp. 561, 563). Ehrlich explained that differences in required stopping distance between trucks and cars are due to differences in composition and inflation of tires and other factors which affect the coefficient of friction in the formula.

Again, there was no contradictory expert testimony on this point or on the calculation of the required stopping distance for this unit at that speed.
[8] Although this consideration is not essential to our decision in this case, it is arguable that the Department (which must exercise a high degree of care to prevent any traffic signal malfunctions) is absolutely liable, without proof of specific negligence or of notice of the malfunction, for a traffic light which indicates a signal to proceed to motorists in both directions. Since this particular malfunction is a trap for motorists and obviously creates a far greater risk than one in which all lights are nonfunctioning or one in which a stop signal shows or blinks in at least one direction, the Department must exercise an extremely high degree of care (and perhaps has an absolute duty) to prevent such a malfunction.
[9] Plaintiff testified that she had decided to consent to the amputation because she could not bear the constant pain. Her appearance at oral argument revealed that amputation had been performed.
[10] Past medical expenses consisted solely of hospitalization and treatment at Charity Hospital. Although the hospital was timely notified, no intervention was filed prior to trial.
[11] We note, but reject, defendants' contention that the expert's use of the $360.00 figure was unjustified, because it did not consider plaintiff's expenses in traveling a substantial distance to earn income at the most recent job. She had no such expense at the earlier job. Moreover, at the time of the accident, plaintiff was earning over $500.00 per month, when the second job was considered.
[12] Thus, we are not presented with the frequently occurring problem as to whether investigating officers are qualified by extensive experience in accident investigation to give conclusions from the facts learned in a routine investigation. While experience in accident investigation may bear on the weight to be accorded to the witness's statement of facts learned in the investigation, that experience alone does not qualify a witness to give opinions in accident reconstruction based on special study in the sciences of physics and engineering. It is indeed highly questionable that experience in accident investigation qualifies a witness to answer any questions calling for conclusions of opinions.
[13] Since the dissenting judge agrees with the modification of the judgment as to reduction of the amount of special damages and the liability of the Department of Highways, there is no basis to submit this case for reargument to a five-judge panel under La.Const.1974, art. 5, § 8(B).