COVINGTON, Judge.
This is a suspensive appeal by Ellen Too-ley Swann, widow of Francis E. Swann, individually and as administratrix of the succession of Francis E. Swann, from a judgmentx,[1] of the trial court signed July 17, 1981, in favor of James E. Daspit and Janet S. Daspit in the amount of $105,000, plus interest and costs.[2]
This case involves a determination of the cause of a fire which occurred on or about September 27,1978[3], at the leased premises known as Swann Supply, destroying the building owned by Swann, and the merchandise and hardware business of the les *608 sees, the Daspits. The hardware business had been sold by the Swanns to the Daspits (partially on credit), and they had also leased the building to the Daspits. U.S. Fire carried fire insurance for the Daspits on the business contents.
The trial court found that the Daspits had proved that the fire was most probably caused by an electrical malfunction, or a defect in the electrical wiring, located in the crawl-space between the ceiling and the roof, which area was not within the control of the lessees. In making this finding, the trial judge observed, in his reasons for judgment, that:
After reviewing all the evidence there is no doubt in the Court’s mind that the fire started in the crawl space between the ceiling and the roof and was more than likely electrical in nature. There is no question in the Court’s mind that this was not within the control of the lessee and was the responsibility of the owner of the building, Mrs. Ellen T. Swann. The Court finds that Mr. James E. Daspit proved to the satisfaction of the Court that it was not his responsibility that caused the fire and the evidence shows that Mrs. Swann failed to show that it was not her responsibility. Accordingly the Court holds that Mrs. Swann is responsible for the damages caused in this matter.
Under LSA-C.C. 2695,[4] the lessor is liable to the lessee for any losses sustained as a result of “vices and defects” in the premises, provided they did not arise as a result of the lessee’s fault.
This case turns on a question of burden of proof, and as to whether the evidence, taken as a whole, establishes that the fire, more probably than not, was caused by fault of defendant Swann.
The fire occurred on a Wednesday afternoon, at a time when the hardware store was closed for business, as was its custom. The first person on the fire scene was A.J. McGehee, the Pearl River Chief of Police. Chief McGehee saw no flames inside the store at that time, but he did observe smoke in the building, coming out the eave area of the second room.
“The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of -such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.”
Steve Baragona, a member of the Pearl River Fire Department, was also one of the first persons on the scene. Upon arrival, he saw smoke coming out of the side of the building in the roof part. When he first walked into the store (after forcing the front doors), he saw very little smoke in the front part of the building. On his second trip inside the store (after getting his mask and equipment), he still only saw a small amount of smoke toward the rear of the store, coming from the ceiling, and he quickly left the store. On neither trip inside the store did Baragona observe flames in the actual store area. Baragona stated that .the fire originated in the area between the ceiling and the roof. He specified that the only space the fire could have started was the crawl-space area, where the electric wires were located. There was no evidence of an explosion.
Ansel Kern, the Civil Defense Director of the City of Pearl River, arrived at the scene at about the same time as did the fire truck. He noticed smoke coming through the roof section, around the eaves and facia boards. He looked through a window and saw smoke inside the store, coming from the ceiling. He did not see flames in the building. As he walked around the building, he observed some firemen pulling boards away from the roof area, and flames appeared in that area. He also smelled traces of ozone, which he said was created by the arcing of electric wires.
Edward Poppler, Chief of the Slidell Fire Department, was called to the fire by the Pearl River Chief to render assistance. When Poppler entered the store, he ob *609 served heavy smoke near the ceiling, but saw no flames inside the building. He testified that the char-depth on the beams indicated that the flames started toward the back of the building.
James Daspit received a call at his home, telling him of the fire. When he arrived at the scene, the fire engines were already there. He noticed that the front door had been broken open, and he could see smoke coming from the facia boards near the roof. He went to Chief McGehee, who told him that the fire had not yet been located. Daspit then entered the store to get his gate key for the Chief. While inside the store, he saw no flames, but he did see smoke near the ceiling in the second room. After unlocking the gate to the yard fence, Daspit saw firemen pulling facia boards from the building. It was after the boards had been removed that he first saw flames, and the flames quickly spread over the roof. In a matter of minutes, the roof section collapsed into the store area.
Daspit further testified that the crawlspace was a small space between the ceiling and the roof. This space was not accessible to and was not used by the Daspits. No paints, thinners, or other flammable materials, or anything else was stored in the area. The only heat source known to have been in the crawl-space was electrical wires running to ceiling light fixtures — the same electrical wires that were in place when the Daspits first leased the building. The Das-pits had not made any electrical repairs or installations in that area.
Patsy Ellis testified that she heard an explosion while working on Mrs. Daspit’s hair at the Ellis Beauty Parlor, about a half block away from the hardware store. Shortly thereafter, Mrs. Ellis heard the fire engines as they went to the scene. She followed the Pearl River fire truck to the scene, and she saw flames, and heard, on arrival, several more explosions coming from the flaming building. She could not state with any degree of certainty that the explosion she first heard came from the hardware store. Mrs. Daspit denied having heard an explosion while in the beauty parlor. Baragona observed no such flames when he arrived on the scene with the Pearl River fire truck; he fought the fire to its conclusion and knew nothing about any explosion. There is nothing in the testimony of any of the firemen or officers at the scene to support the testimony of Mrs. Ellis concerning the flames and explosions.
There were several suggestions made by appellant’s expert in industrial and occupational safety, Stanley L. Day, as to possible causes. However, Day admitted that he could not reach a “firm conclusion” as to the cause and origin of the fire. A possibility suggested by Day dealt with spontaneous combustion or ignition of flammable materials located on the ground floor of the store; however, the firemen and the officers testified to seeing no flames on the ground floor level at the start. Day’s suggestion of the forced air heater as being the source of the fire was also ruled out by the testimony of those at the scene.
Francis A. Richard, an independent adjuster, when asked as to where and how the fire started, testified as follows:
Q. Could you conclude from your investigation where the fire might have started?
A. Yes.
Q. Where do you think?
A. In the crawl space or attic space between the ceiling in the store and the roof.
Q. What facts that you got from the people that you interviewed indicated to you that there might have been fire originating in the crawl space in the attic?
A. Well, the — first of all, we had our own insured’s statement that he gave us. The fact that he had entered the store. We also had Mr. Ansel Kern, I believe, that we interviewed who was one of the first people on the scene, who told us where he saw the smoke coming from around the eaves of the building, if you will. That when they entered the building when *610 the firemen arrived, there was no fire on the inside of the building. There was some smoke but no fire and since fire always burns up, you know, it was a foregone conclusion from the fact where the firemen were fighting to try to get to the fire. They were trying to pull off siding to get to the crawl space. The fire couldn’t be located. It obviously was very concealed and not in the open area of the store.
Q. Could there have been more than one cause of the fire in your opinion?
A. Well, we pretty much ruled out the weather situation and because of the location of the fire, we came to the conclusion that the fire was in all likelihood electrical in origin.
Dr. Robert L. Drake, an electrical engineering expert, testified that the wires he examined which came from the burned building were of substandard quality and were not suitable for use in certain locations.
We believe the evidence clearly preponderates in favor of the trial court’s conclusion that the fire started from defective electrical wiring located in the crawl-space between the ceiling and the roof of the hardware store. While plaintiffs must establish their claim by a fair preponderance of evidence, direct or circumstantial, it is not necessary that they do so beyond all doubt. Their burden has been successfully borne when the evidence, as a whole, shows that the defendant’s fault was the most plausible or likely cause of the fire and when no other factor can as reasonably be ascribed as the cause. The likelihood of causation due to the particular defendant’s fault must preponderate over the likelihood of causation from any other factor. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972); Hanover Insurance Company v. Jacobson-Young, Inc., 294 So.2d 564 (La.App. 4th Cir.1974); Nickens v. McGehee, 184 So.2d 271 (La.App. 1st Cir.1966), writ refused 249 La. 199, 186 So.2d 159 (1966).
In the instant case, the trial court determined that the plaintiffs established that the defendant’s fault was the most plausible cause of the fire. Such a finding of fact is not to be disturbed in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). There was a considerable amount of impressive circumstantial evidence from which the trier of fact could have reasonably concluded that the fire was caused by an electrical defect in the wiring in the crawl-space between the ceiling and the roof. There was no credible evidence from which one could conclude that the fire was caused by fault attributable to the lessees, or from any other source. Therefore, we find that the evidence preponderates in the plaintiffs’ favor.
On the question of damages to the Das-pits, the trial court found that the loss of the Daspits was $105,000.00, as follows:
The question of damages as to Mr. Daspit is very difficult to assess in view of the loss of the records of the business in the fire. Mr. Daspit has established that he had a beginning inventory of $95,000.00 at the beginning of the year in addition he had purchased $56,824.00 worth of merchandise. He had total sales of $51,-672.20 to the date of the fire in 1978. In view of the fact that his sales would represent a profit margin he should have had an excess of $100,000.00 in merchandise in the store at the time of the fire. In addition to the cost of the merchandise he had furnishings which if established at a cost less depreciation would amount to $3,285.83. But as pointed out at the trial the furnishings would probably cost a great deal more if these items had to be replaced inasmuch as the figures were used for income tax purposes rather than the actual value at the time of the fire. The Court believes that the evidence supports the finding of $105,000.00 as being the loss suffered by Mr. Daspit in the destruction of his business by the fire. Accordingly the Court will award him the sum of $105,000.00 subject to the claim of *611 U.S. Fire Insurance Company in the amount of $75,000.00 and the claim of Mrs. Swann.
Where damages cannot be accurately measured or proven, the trial court is vested with considerable discretion in the assessment of damages as may be warranted by the facts and circumstances. An award made under such circumstances will not be disturbed unless it appears that the trial court has abused its discretion in fixing the amount thereof. Nickens v. McGe-hee. In the instant case, we find that the trial court gave due consideration to the facts and circumstances involved; hence, we find no abuse of discretion. Thus, the Daspits are entitled to recover the sum of $105,000.00 subject to the claim of U.S. Fire in the amount of $75,000.00 and the claim of Swann in the amount of $25,548.18, plus interest and attorney fees.
For the reasons assigned, we amend the judgment signed July 17, 1981, to accord with the October 2, 1981, amended judgment, and as amended the judgment appealed is affirmed. Costs of this appeal are to be borne by appellant.
AMENDED AND AFFIRMED.

. There are judgments also in favor of U.S. Fire Insurance Company and against Mrs. Swann in the amount of $75,000, and in favor of Mrs. Swann in the sum of $25,545.18 on her demand against the Daspits. The judgment was amended October 2, 1981, to show that the award to the Daspits was subject to a credit of $75,000.00 to be paid to the insurance company as subrogee.

. There were three related cases on the docket of the trial court: The present case, which is a suit for damages .brought by the Daspits against Mrs. Swann for a fire loss; the second case, 436 So.2d 611, in which Mrs. Swann sought recovery on a promissory note given by the Daspits in the purchase of a business and of damages for breach of contract for failure to keep insured against fire loss the premises leased to the Daspits; and the third case, 436 So.2d 612, in which U.S. Fire Insurance Company, as the subrogated fire insurer, sought recovery of the amount paid by it to the Das-pits for their fire loss. We are rendering a separate judgment in each case. The last case had been dismissed as an appeal by another panel of this Court on March 2, 1982, 411 So.2d 1173, but has now been reinstated on order of the Louisiana Supreme Court, 424 So.2d 240, decided November 29, 1982.

.The fire report and other documents give the date of the fire as September 27, 1978 although some of the testimony and the Louisiana Supreme Court mention September 20, 1978 as the date of the fire. During his testimony, Mr. Daspit and his counsel referred to September 27, 1978 as the date of the fire. The date is not significant for purposes of these cases, since obviously there was only one fire (which totally destroyed the building).

. LSA-C.C. art. 2695 provides: